[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-10387

_____

D.C. Docket No. 5:10-cv-00302-CAR


GEORGIACARRY.ORG, INC., THE BAPTIST
TABERNACLE OF THOMASTON GEORGIA INC.,
EDWARD STONE, JONATHAN WILKINS,

Plaintiffs-Appellants,


versus


THE STATE OF GEORGIA, UPSON COUNTY GEORGIA,
GOVERNOR OF GEORGIA,
COUNTY MANAGER KYLE HOOD,

Defendants-Appellants.


_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(July 20, 2012)

Before TJOFLAT, CARNES and ANDERSON, Circuit Judges.

TJOFLAT, Circuit Judge:

In 2010, the Georgia legislature, apparently concerned that the carrying of weapons[1] and long guns[2] would likely present an unreasonable risk of harm to people who assemble in eight specific locations, enacted a statute barring the unrestricted carrying of weapons or long guns in those locations.  O.C.G.A. § 16-11-127(b) (this provision is hereinafter referred to as the "Carry Law").[3]  This

_____

[1]  A "weapon" is a "knife or handgun."  O.C.G.A. § 16-11-125.1(5).  A knife is "a cutting instrument designed for the purpose of offense and defense consisting of a blade that is greater than five inches in length which is fastened to a handle."  Id. § 16-11-125.1(2).  This case involves the carrying of a handgun.

[2]  A "long gun" is a "firearm with a barrel length of at least 18 inches and overall length of at least 26 inches designed . . . to be fired from the shoulder[.]"  Id. § 16-11-125.1(4).

[3]   O.C.G.A. § 16-11-127 reads, in relevant part:

(b) A person shall be guilty of carrying a weapon or long gun in an unauthorized location and punished as for a misdemeanor when he or she carries a weapon or long gun while:

    (1) In a government building;

    (2) In a courthouse;

    (3) In a jail or prison;

    (4) In a place of worship;

    (5) In a state mental health facility . . .;

    (6) In a bar . . .;

    (7) On the premises of a nuclear power facility . . .; or

    (8) Within 150 feet of any polling place

2

statutory bar does not apply, however, to a license holder[4] if, on arriving at one of

the eight locations, such person "approaches security or management personnel

upon arrival . . . and notifies such security or management personnel of the

presence of the weapon or long gun and explicitly follows the security or

management personnel's direction for removing, securing, storing, or temporarily

surrendering such weapon or long gun." Id. § 16-11-127 (d)(2).  The refusal to

---

(c) Except as provided in Code Section 16-11-127.1, a license holder or person recognized under subsection (e) of Code Section 16-11-126 shall be authorized to carry a weapon as provided in Code Section 16-11-135 and in every location in this state not listed in subsection (b) of this Code section; provided, however, that private property owners or persons in legal control of property through a lease, rental agreement, licensing agreement, contract, or any other agreement to control access to such property shall have the right to forbid possession of a weapon or long gun on their property, except as provided in Code Section 16-11-135.  A violation of subsection (b) of this Code section shall not create or give rise to a civil action for damages.

(d) Subsection (b) of this Code section shall not apply:

. . .

(2) To a license holder who approaches security or management personnel upon arrival at a location described in subsection (b) of this Code section and notifies such security or management personnel of the presence of the weapon or long gun and explicitly follows the security or management personnel's direction for removing, securing, storing, or temporarily surrendering such weapon or long gun[.]

(emphasis added).

    [4] O.C.G.A. § 16-11-126 describes under what circumstances a person needs a weapons carry license in order to possess and carry a weapon or long gun.  In essence, the statute prohibits carrying a weapon or long gun without a valid license, unless the carrying falls under one of seven situations not relevant to this case.

3

approach security or management personnel or to comply with management's direction is a misdemeanor.  Id. § 16-11-127 (b).

One of the eight locations designated in the Carry Law is a "place of worship."  Id. § 16-11-127(b)(4).  In this case, Edward Stone and Jonathan Wilkins ("Plaintiffs") each allege in their Amended Complaint that they regularly attend religious services, possess a weapons carry license, and "would like to carry a handgun" while in a place of worship.  Plaintiffs seek a declaration that the Carry Law is unconstitutional on its face and as applied to them because compliance with § 16-11-127 will violate their First Amendment right to the free exercise of their religion[5] and their Second Amendment right to bear arms.[6]  The United States District Court for the Middle District of Georgia found no merit in either claim and dismissed the Amended Complaint with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).[7]  Plaintiffs now appeal the District Court's judgment, arguing that the allegations in the Amended Complaint are

---

[5]  The First Amendment provides, in pertinent part, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.

[6]  The Second Amendment reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

[7]  Federal Rule of Civil Procedure 12(b)(6) provides that a district court may grant a motion to dismiss for a "failure to state a claim upon which relief can be granted."

4

sufficient to make out a case that the Carry Law's place of worship provision is

unconstitutional either on its face or as applied to Plaintiffs.[8]

## I.

This case began on July 12, 2010, in the Superior Court of Upson County,

Georgia.  Plaintiffs sued the State of Georgia and Upson County in a two-count

complaint presenting the constitutional claims referred to above and seeking

declaratory and injunctive relief under 42 U.S.C. § 1983 in the Superior Court of

Upson County.[9]  The State and the County removed the case to the District Court

pursuant to 28 U.S.C. §§ 1441 and 1446.  Plaintiffs amended their complaint to

add two defendants, the Governor of Georgia and the Manager of Upson County,

and two counts.  Their Amended Complaint then read as follows: Count 1, a

---

[8] GeorgiaCarry.Org, Inc., and the Baptist Tabernacle of Thomaston, Georgia, Inc., co-plaintiffs with Stone and Wilkins, also appeal the District Court's judgment.  GeorgiaCarry.Org has members, who, like Stone and Wilkins, possess a weapons carry license, regularly attend religious services, and "would like to carry a handgun" in "places of worship."  Baptist Tabernacle "would like to have [its] members armed for the protection of its members attending worship services."  Since the claims of GeorgiaCarry.Org and Baptist Tabernacle are essentially identical to Stone's and Wilkins's, this opinion does not refer to these co-plaintiffs unless necessary for context.

[9] 42 U.S.C. § 1983 states, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

5

"direct action," asserted that the Carry Law "interfered with" Plaintiffs' free exercise of religion; Count 2, brought under § 1983, replicated Count 1; Count 3, another "direct action," asserted that the Carry Law infringes Plaintiffs' right to keep and bear arms; Count 4, brought under § 1983, replicated Count 3.[10]

The State of Georgia and the Governor jointly moved to dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(1)[11] on the grounds of Eleventh Amendment immunity[12] and Plaintiffs' lack of standing to sue, and under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for relief.  Upson County and the County Manager separately moved the court to dismiss the Amended Complaint under Rule 12(b)(1) for Plaintiffs's lack of

---

[10]  The Amended Complaint, contained a fifth count seeking an injunction against the State's expenditure of funds to enforce the Carry Law's "place of worship" provision.  The District Court dismissed Count 5 because Plaintiffs' claims on Counts 1 through 4 failed to state a claim for relief.  Plaintiffs appealed the District Court's judgment dismissing the Amended Complaint, but their brief contains no argument that the court erred in dismissing Count 5.  The appeal as to that count is accordingly abandoned.  United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (considering an argument abandoned when "a party seeking to raise a claim or issue on appeal [fails to] plainly and prominently so indicate.").

[11]  Federal Rule of Civil Procedure 12(b)(1) permits a district court to dismiss for "lack of subject-matter jurisdiction."

[12]  See U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); see also Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984) ("This Court's decisions thus establish that 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.'" (quoting Employees v. Missouri Public Health & Welfare Dep't, 411 U.S. 279, 280, 93 S. Ct. 1614, 1616, 36 L. Ed. 2d 251 (1973))).

standing, and under Rule 12(b)(6) because the Amended Complaint failed to state a claim for relief.

In addressing the defendants' motions, the District Court bypassed the question of whether Plaintiffs had standing to sue and went straight to the question of whether any of the counts of the Amended Complaint stated a claim for relief. The court found that none of the counts stated a claim, and therefore dismissed the respective counts on the merits. The court dismissed all counts against the State on the additional ground of Eleventh Amendment immunity.[13] Before we decide whether the District Court erred in dismissing the four counts of the Amended Complaint under Rule 12(b)(6), we must address an issue the District Court bypassed: whether Plaintiffs lacked standing to sue.[14] It is to that issue that we turn now.

II.

---

[13]  In addition to arguing that the District Court erred in dismissing their claims under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs also challenge the court's dismissal of the claims against the State on the Eleventh Amendment ground. Because we conclude that none of the counts of the Amended Complaint states a claim for relief, we need not, and do not, address the Eleventh Amendment issue.

[14]  See Anago Franchising, Inc. v. Shaz, LLC, 677 F.3d 1272, 1275 (11th Cir. 2012) ("We have an independent obligation to determine whether jurisdiction exists in each case before us, so we may consider questions of jurisdiction sua sponte even when, as here, the parties have not raised jurisdictional challenges." (citing Arbaugh v. Y&H Corp., 546 U.S. 500, 514, 126 S. Ct. 1235, 1244, 163 L. Ed. 2d 1097 (2006))).

7

"The judicial Power [of the United States] shall extend to all Cases, in Law and Equity, arising under this Constitution."  U.S. Const. art. III, § 2.  To establish an Article III "case," see Summers v. Earth Island Inst., 555 U.S. 488, 492–93, 129 S. Ct. 1142, 1148–49, 173 L. Ed. 2d 1 (2009) ("In limiting the judicial power to 'Cases' and 'Controversies,' Article III of the Constitution restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law."), a plaintiff must establish standing, which requires a showing that

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180–181, 120 S. Ct. 693, 704, 145 L. Ed. 2d 610 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561, 112 S. Ct. 2130, 2136, 119 L. Ed. 2d 351 (1992)).  Case law from both the Supreme Court and this court is clear: because we must afford special protection for the exercise of constitutional rights, a plaintiff does not always need to risk prosecution to obtain preventative relief when his or her exercise of a constitutional right at stake.  See Steffel v. Thompson, 415 U.S. 452, 459, 94 S. Ct. 1209, 1215, 39 L. Ed. 2d 505 (1974) ("[I]t

8

is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights."); Jacobs v. Florida Bar, 50 F.3d 901, 904 (11th Cir. 1995) ("A plaintiff stating that he 'intends to engage in a specific course of conduct arguably affected with a constitutional interest, . . . does not have to expose himself to enforcement to be able to challenge the law.'" (quoting ACLU v. Florida Bar, 999 F.2d 1486, 1492 (11th Cir. 1993))). Instead, a plaintiff with the exercise of a constitutional right at stake may seek declaratory or injunctive relief prior to the challenged statute's enforcement. See Ex Parte Young, 209 U.S. 123, 150–51, 28 S. Ct. 441, 450, 52 L. Ed. 714 (1908) (concluding that state officials may be enjoined by a federal court of equity and that a federal court may, in appropriate circumstances, enjoin future state criminal prosecutions if the state officials threaten to enforce an unconstitutional statute).

The "injury" in this pre-enforcement context is the well-founded fear that comes with the risk of subjecting oneself to prosecution for engaging in allegedly protected activity. Babbitt v. UFW, 442 U.S. 289, 298–99, 99 S. Ct. 2301, 2309, 60 L. Ed. 2d 895 (1979) ("When plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a

9

federal court." (quoting Younger v. Harris, 401 U.S. 37, 42, 91 S. Ct. 746, 749, 27 L. Ed. 2d 669 (1971))); see also Virginia v. Am. Booksellers Ass'n, Inc., 484 U.S. 383, 393, 108 S. Ct. 636, 643, 98 L. Ed. 2d 782 (1988) (finding that allegations were sufficient when plaintiffs alleged "actual and well-founded fear that law will be enforced against them.").

This court has held that a risk of prosecution is sufficient if the plaintiff alleges (1) that an actual threat of prosecution was made, (2) that prosecution is likely, or (3) that a credible threat of prosecution exists based on the circumstances. See Jacobs, 50 F.3d at 904. To show that a prosecution is likely or a credible threat exists, a plaintiff must show that there is "a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement." Am. Civil Liberties Union v. Florida Bar, 999 F.2d 1486, 1492 (11th Cir. 1993) (quoting Babbitt v. United Farm Workers Nat. Union., 442 U.S. 289, 298, 99 S. Ct. 2301, 2308, 60 L. Ed. 2d 895 (1979)). We look to see "whether the plaintiff is seriously interested in disobeying, and the defendant seriously intent on enforcing the challenged measure." Id. at 1493 (quoting Int'l Soc'y for Krishna Consciousness v. Eaves, 601 F.2d 809, 818 (5th Cir. 1979)).

Although the Amended Complaint is lacking in many respects, we believe that Plaintiffs have alleged a credible threat of prosecution under the Carry Law

10

sufficient to establish standing to bring a facial challenge.  They are license holders who regularly attend services at a place of worship.  Moreover, they "would like to carry a handgun in such place of worship for the protection of [their] family and [themselves], but [they are] in fear of arrest and prosecution."  It thus seems clear that Plaintiffs are seriously interested in engaging in conduct that is arguably prohibited by the Carry Law and that could give rise to prosecution by state authorities.  Nothing in the defendants' answers suggests that the Carry Law will not be vigorously enforced.  Therefore, we cannot say that there exists only a "speculative risk" of prosecution; rather, Plaintiffs appear to be subject to a legitimate threat that they will be prosecuted for activity that, they believe, is constitutionally protected.  And, if the court granted the relief that Plaintiffs' seek, we would surely provide redress for the alleged constitutional infringement at issue.

## III.

Having concluded that Plaintiffs have standing to prosecute their claims, we turn to the question of whether the District Court erred in dismissing Counts 1 and 2 of the Amended Complaint—the allegation that Plaintiffs' forced compliance with the Carry Law will infringe their right to the free exercise of their religion, in violation of the First Amendment.

11

A.

The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]"  U.S. Const. amend. I (emphasis added).  The Free Exercise Clause of the First Amendment is applicable to the States through the Due Process Clause of the Fourteenth Amendment.  See Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S. Ct. 900, 903, 84 L. Ed. 1213 (1940).  The protections afforded by the Free Exercise Clause prevent the government from discriminating against the exercise of religious beliefs or conduct motivated by religious beliefs.  See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532, 113 S. Ct. 2217, 2226, 124 L. Ed. 2d 472 (1993) ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons.").

1.

Counts 1 and 2 allege that the Carry Law "interferes with the free exercise of religion by Plaintiffs by prohibiting them from engaging in activities in a place of worship when those activities are permitted throughout the state."  Count 1, labeled a "direct action," purports to state a cause of action directly under the First Amendment.  The Amended Complaint, however, does not cite the statutory

12

source of the District Court's jurisdiction to entertain Count 1; nor does the District Court's order dismissing it. The District Court ruled on the merits of Count 1; thus, we assume that the court found jurisdiction under 28 U.S.C. § 1331, which gives the district courts "original jurisdiction of all civil actions arising under the Constitution . . . of the United States." The First Amendment does not explicitly create the cause of action Count 1 attempts to assert, and we are aware of no case holding that such cause of action is implied when the relief a plaintiff seeks is plainly available through a mechanism created by Congress.[15] In light of this, the District Court did not err in dismissing Count 1 pursuant to Rule 12(b)(6) for failure to state a claim for relief.

Count 2 asserts a claim under 42 U.S.C. § 1983.[16] Once again, neither the Amended Complaint nor the District Court's order cites the source of the District Court's jurisdiction to consider the claim. Because the court addressed Count 2 on the merits, we assume that it found jurisdiction under § 1331 and 28 U.S.C.

---

[15] Where a statute provides an adequate remedy, we will not imply a judicially created cause of action directly under the Constitution. See Bush v. Lucas, 462 U.S. 367, 390, 103 S. Ct. 2404, 2417, 76 L. Ed. 2d 648 (1983); Schweiker v. Chilicky, 487 U.S. 412, 414, 425, 108 S. Ct. 2460, 2468–69, 101 L. Ed. 2d 370 (1988); see also Williams v. Bennett, 689 F.2d 1370, 1390 (11th Cir. 1982).

[16] See 42 U.S.C. § 1983 ("Every person who . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.").

13

§ 1343, which gives the District Courts "original jurisdiction of any civil action authorized by law to be commenced by any person . . . [t]o redress the deprivation, under color of any State law . . . of any right . . . secured by the Constitution of the United States."  28 U.S.C. § 1343.

Section 1983 gives a party who claims to have suffered the deprivation of a constitutional right at the hands of a person acting "under color of" state law "an action at law [or] suit in equity" against such person "for redress."  42 U.S.C. § 1983.  In this case, the redress Plaintiffs seek is a declaration that the "place of worship" provision is unconstitutional on its face and as applied to them.  The State of Georgia, however, is not a "person" subject to suit under § 1983.  See Will v. Michigan Dept. of State Police, 491 U.S. 58, 65–66, 109 S. Ct. 2304, 2309, 105 L. Ed. 2d 45 (1989) (concluding that a State is not a "person" under § 1983).  The District Court dismissed the State under the Eleventh Amendment, but could have dismissed it on the ground that it is not amenable to § 1983 liability.  Upson County would be subject to § 1983 liability, though, if it caused through the enforcement of County policy the constitutional deprivation Plaintiffs say they would suffer, but the Amended Complaint fails to allege that their prosecution for

14

refusing to comply with the Carry Law would be pursuant to County policy.[17]

Hence, the District Court properly dismissed Count 2 against the County. The

County Manager is amenable to § 1983 liability, but Count 2 contains no

allegation of wrongdoing specific to him. Accordingly, the court did not err in

dismissing Count 2 as to the Manager.

This brings us to the Governor. Part of the Governor's job is to ensure the

enforcement of Georgia's statutes.[18] He is subject to suit under § 1983, and the

District Court properly entertained Plaintiffs' Count 2 allegations against him. We

now address the question of whether Count 2 states a claim for declaratory relief

against the Governor sufficient to survive a motion to dismiss.

---

[17] Municipalities can serve as a "person" for the purposes of a suit under § 1983. See Monell v. Dep't of Social Servs., 436 U.S. 658, 690, 98 S. Ct. 2018, 2035–36, 56 L. Ed. 2d 611 (1978). To hold a municipality liable, however, a plaintiff must point to a policy of the municipality, the enforcement of which will infringe a constitutional right. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 415, 117 S. Ct. 1382, 1394, 137 L. Ed. 2d 626 (1997) ("Congress did not intend municipalities to be held liable unless deliberate action attributable to the municipality directly caused a deprivation of federal rights."). Plaintiffs here have not done so. See Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) ("A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality . . . . A custom is a practice that is so settled and permanent that it takes on the force of law." (quoting Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997))).

[18] Georgia law arguably endows the Governor with law enforcement authority, although other officials, who are charged specifically to enforce the law, would certainly be more appropriate defendants. See Luckey v. Harris, 860 F.2d 1012, 1016 (11th Cir. 1988) ("According to the Georgia constitution, the governor is responsible for law enforcement in that state and is charged with executing the laws faithfully." (citing Ga. Const. art. 5, § 2)).

15

2.

To survive a motion to dismiss, a plaintiff must "plead factual matter that, if taken as true, states a claim" that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 666, 129 S. Ct. 1937, 1942–43, 173 L. Ed. 2d 868 (2009). This necessarily requires that a plaintiff include factual allegations for each essential element of his or her claim. Randall v. Scott, 610 F.3d 701, 707 n.2 (11th Cir. 2010) ("[C]omplaints . . . must now contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." (internal quotations omitted)); Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)).

Plaintiffs allege that the Carry Law "interferes with the free exercise of religion by Plaintiffs by prohibiting them from engaging in activities in a place of worship when those activities are generally permitted throughout the state." Am. Compl. at ¶¶ 39, 42. This so-called prohibition applies to anyone who enters a place of worship—regardless of the person's religious preference. Count 2 is styled as both a facial challenge, see United States v. Salerno, 481 U.S. 739, 745, 107 S. Ct. 2095, 2100, 95 L. Ed. 2d 697 (1987) (holding that, to succeed on a facial challenge, a plaintiff must prove "that no set of circumstances exists under

16

which the [statute] would be valid," or in other words, that the law is unconstitutional in all of its applications."),[19] and an as-applied challenge.[20]

We conclude that the Amended Complaint fails to state a Free Exercise Clause challenge because Plaintiffs omit any factual matter showing how the Carry Law burdens a sincerely held religious belief. Plaintiffs argue that such an allegation is unnecessary if a law is subject to strict scrutiny because it is not

---

[19] While Salerno is often criticized, its holding remains binding precedent, which we faithfully apply here. See Gulf Power Co. v. United States, 187 F.3d 1324, 1336 n.9 (11th Cir. 1999) (noting that three current or former Supreme Court Justices— retired Justice Souter, Justice Ginsburg, and retired Justice Stevens— have questioned Salerno's "no set of circumstances" formulation of the facial challenge standard); see also Fla. League of Prof'l Lobbyists, Inc. v. Meggs, 87 F.3d 457, 459 (11th Cir. 1996) (discussing "how high the threshold for facial invalidation should be set" and recognizing the substantial disagreement among the Court over whether a facial challenge should require proof that a law is unconstitutional in all applications or merely most of its applications).

[20] The Amended Complaint does not state an as-applied challenge. Plaintiffs argue that the Carry Law, as applied to them, violates their constitutional rights, even though the Carry Law has not yet been applied to them. To us, this appears to be an inherent contradiction. Compare Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1308 (11th Cir. 2009) ("Because [an as-applied] challenge asserts that a statute cannot be constitutionally applied in particular circumstances, it necessarily requires the development of a factual record for the court to consider." (citing Siegel v. LePore, 234 F.3d 1163, 1171 (11th Cir. 2000))) with Am. Charities for Reasonable Fundraising Reg., Inc. v. Pinellas County, 221 F.3d 1211, 1214 (11th Cir. 2000) ("To establish their standing to bring an as-applied challenge [in the context of a pre-enforcement challenge], [p]laintiffs need to demonstrate that a 'credible threat of an injury exists,' not just a speculative threat which would be insufficient for Article III purposes." (quoting Kirby v. Siegelman, 195 F.3d 1285, 1290 (11th Cir. 1999)). Even taking the language in American Charities at face value—that somehow it is possible to bring an as-applied challenge in a pre-enforcement review of a statute that has yet to be applied—we believe that there are few situations where that type of challenge would prevail. Such a situation could arise when the factual context of the challenge is so clear and uncontroverted that there is no question as to how the statute will be applied. If this is the case, a plaintiff's complaint must include all of the factual allegations necessary to clearly illustrate the context in which the statute will be applied, which Plaintiffs certainly failed to do here.

17

neutral or generally applicable.[21]  The problem with that argument is that it

misconstrues clear, well-established First Amendment precedent from both the

---

[21]  As Plaintiffs correctly observe, the Supreme Court has identified two standards of review that are to be used, depending on the type of law at issue in a First Amendment challenge. If a law is one that is neutral and generally applicable, then rational basis scrutiny should be applied, requiring that the plaintiff show that there is not a legitimate government interest or that the law is not rationally related to protect that interest.  See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531, 113 S. Ct. 2217, 2226, 124 L. Ed. 2d 472 (1993) ("In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." (citing Empl't Div., Dept. of Human Res. of Ore. v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990)).  If, however, a law is not neutral or generally applicable, either because the law is facially discriminatory or, alternatively, because "the object of [the] law is to infringe upon or restrict practices because of their religious motivation," then strict scrutiny is the proper framework, which would then require the State to show there is a compelling governmental interest and that the law is narrowly tailored.  See id. at 531–32, 113 S. Ct. at 2225 ("Neutrality and general applicability are interrelated, and, as becomes apparent in this case, failure to satisfy one requirement is a likely indication that the other has not been satisfied.  A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.").

18

Supreme Court and this court.[22]  Given that precedent, they have failed to state a plausible First Amendment claim.

B.

1.

First Amendment Free Exercise Clause precedent is clear: a plaintiff must allege a constitutionally impermissible burden on a sincerely held religious belief to survive a motion to dismiss.  This is so because, as a threshold issue—before a court even considers whether a law is subject to the rational basis test or, alternatively, strict scrutiny—a court must be able to determine that the protection of the Free Exercise Clause is triggered.[23]

---

[22]  Plaintiffs consistently maintained, both before the District Court and this court, that they need not allege that a sincerely held religious belief was burdened in any way.  Appellants' Br. at 15.  In fact, before the District Court, Plaintiffs expressly denied that they were alleging any impact on their religious beliefs:

> Defendants insist that free exercise challenges must involve a statute that "impermissibly burden[s] one of [a plaintiff's] sincerely held religious beliefs." The cases that apply Defendants' argument involve laws that are neutral and of general applicability. Defendants admit their law is neither neutral nor generally applicable, but they have failed to cite a single case where a law that is not neutral toward religion required a showing of a burden on a sincerely held religious belief.  In cases where the law at issue is not neutral, there is no burden test.

Pls. Resp. to Supplemental Br. Defs. State of Georgia and Gov. Sonny Perdue in Supp. of Defs. Mot. to Dismiss at 13–14; see also Pls. Br. Supp. Mot. Prelim. Inj. at 10 ("[I]t is true that Plaintiffs do not assert that their religious beliefs require them to carry guns to 'places of worship'[.]").

[23]  We need not, and do not, decide whether the Carry Law is subject to strict scrutiny, as Plaintiffs suggest, or rational basis scrutiny.  We merely conclude that even if strict scrutiny did

19

The Supreme Court has reiterated time and time again that personal preferences and secular beliefs do not warrant the protection of the Free Exercise Clause.  See Frazee v. Illinois Dep't of Employment Sec., 489 U.S. 829, 833, 109 S. Ct. 1514, 1517, 103 L. Ed. 2d 914 (1989) ("There is no doubt that '[o]nly beliefs rooted in religion are protected by the Free Exercise Clause[.]'  Purely secular views do not suffice." (quoting Thomas v. Review Bd. of Ind. Emp't. Sec. Div., 450 U.S. 707, 713, 101 S. Ct. 1425, 1430, 67 L.Ed.2d 624 (1981))); Wisconsin v. Yoder, 406 U.S. 205, 215–216, 92 S. Ct. 1526, 1533, 32 L. Ed. 2d 15 (1972).  Put another way, a complaint fails to state a Free Exercise claim if it does not allege that (1) the plaintiff holds a belief, not a preference, that is sincerely held and religious in nature, not merely secular; and (2) the law at issue in some way impacts the plaintiff's ability to either hold that belief or act pursuant to that belief.  See Church of the Lukumi Babalu Aye, 508 U.S. at 532, 113 S. Ct. at 2226 ("At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons.").

---

apply to this challenge, Plaintiffs would not prevail.

Despite Plaintiffs' arguments to the contrary, the Supreme Court's Church

of the Lukumi Babalu[24] decision reaffirms that to survive a motion to dismiss all

Free Exercise Clause challenges must include allegations that the law at issue

creates a constitutionally impermissible burden on a sincerely held religious

belief.[25]  This court has followed the Supreme Court's lead, see Watts v. Fla. Int'l

---

[24]  In Church of the Lukumi Babalu, the Court, applying strict scrutiny, held that a city ordinance that prohibited the sacrifice of animals violated the Free Exercise Clause of petitioners who were members of a Santeria religion.  See Church of the Lukumi Babalu Aye, 508 U.S. at 524, 113 S. Ct. at 2222.  The Court found that the Santeria religion employs animal sacrifice as a principal form of devotion.  Id.  Because the ordinance had an impermissible object to burden the sincerely held religious beliefs of the Santeria religion, it violated the protections of the First Amendment.  Id.

[25]  We focus on the opinion's introduction to part II.  In this introduction the Court concludes, "We must consider petitioners' First Amendment claim."  Church of the Lukumi Babalu Aye, 508 U.S. at 531, 113 S. Ct. at 2226.  This, in turn, leads us to ask another question: what threshold issues did the Supreme Court decide in order to reach its conclusion that the Free Exercise Clause was sufficiently implicated such that it needed to consider the petitioners' First Amendment claim?  We start by quoting the introduction in its entirety:

> The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  The city does not argue that Santeria is not a "religion" within the meaning of the First Amendment.  Nor could it.  Although the practice of animal sacrifice may seem abhorrent to some, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."  Given the historical association between animal sacrifice and religious worship, petitioners' assertion that animal sacrifice is an integral part of their religion "cannot be deemed bizarre or incredible."  Neither the city nor the courts below, moreover, have questioned the sincerity of petitioners' professed desire to conduct animal sacrifices for religious reasons.  We must consider petitioners' First Amendment claim.

Id. at 531, 113 S. Ct. at 2225–26 (internal references omitted) (internal quotations omitted).

21

Univ., 495 F.3d 1289, 1294 (11th Cir. 2007) (Carnes, J.) ("To plead a valid free

exercise claim, [a plaintiff] must allege that the government has impermissibly

burdened one of his 'sincerely held religious beliefs.'" (quoting Frazee v. Ill.

Dep't of Emp't. Sec., 489 U.S. 829, 834, 109 S. Ct. 1514, 1517, 103 L. Ed. 2d 914

---

By deconstructing this paragraph sentence by sentence, we see that the Supreme Court engaged in exactly the analysis that Plaintiffs claim is inapposite to a law subject to strict scrutiny. The Court first cites the overarching rule at issue—the First Amendment. Id. ("The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, provides that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]'" (internal references omitted)). Next, the Court sets out that what is at issue is religious in nature, id. ("The city does not argue that Santeria is not a "religion" within the meaning of the First Amendment. Nor could it."), and that there is a religious belief, not merely a preference at stake, id. ("Although the practice of animal sacrifice may seem abhorrent to some, 'religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection.'" (quoting Thomas, 450 U.S. at 714, 101 S. Ct. at 1430. The Court then establishes that this religious belief is sincerely held. Id. ("Neither the city nor the courts below, moreover, have questioned the sincerity of petitioner' professed desire to conduct animal sacrifices for religious reasons."). Finally, the Court illustrates how the sincerely held religious belief at issue (animal sacrifice) is burdened by the governmental regulation (prohibiting animal sacrifice). Id. at 526–31, 113 S. Ct. at 2222–25 (explaining the Santeria religion and, in light of the conflict of these beliefs with the ordinances described by the court immediately preceding the introduction, turning to the merits of the First Amendment claim).

22

(1989))), and our sister circuits are in accord with our position.[26]   With this pleading issue now clear, we turn to Plaintiffs' Amended Complaint.

2.

To be brief, the Amended Complaint fails to state a claim for relief under the First Amendment.  See Iqbal, 556 U.S. at —, 129 S. Ct. at 1949.  We searched the Amended Complaint to no avail in an attempt to find factual allegations that could possibly be construed as alleging that the Carry Law imposes a constitutionally impermissible burden on one of Plaintiffs' sincerely held religious beliefs.  At various points, Plaintiffs allege that they would like to carry a handgun in a place of worship for the protection either of themselves, their family, their flock, or other members of the Tabernacle.  Plaintiffs conclude by alleging that the Carry Law interferes with their free exercise of religion by prohibiting them from

---

[26]  See Parker v. Hurley, 514 F.3d 87, 99 (1st Cir. 2008) ("Even if [Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S. Ct. 1595, 108 L .Ed. 2d 876 (1990),] largely set aside in free exercise jurisprudence, at least in some contexts, 'the balancing question—whether the state's interest outweighs the plaintiff's interest in being free from interference,' it did not alter the standard constitutional threshold question.  That question is 'whether the plaintiff's free exercise is interfered with at all.'" (citation omitted)); Levitan v. Ashcroft, 281 F.3d 1313, 1320 (D.C. Cir. 2002) ("[T]he First Amendment is implicated when a law or regulation imposes a . . . burden on the litigant's religious practice.  Our cases make clear that this threshold showing must be made before the First Amendment is implicated."); Bauchman ex rel. Bauchman v. W. High Sch., 132 F.3d 542, 557 (10th Cir. 1997) ("To state a claim for relief under the Free Exercise Clause, [a plaintiff] must allege something more than the fact the song lyrics and performance sites offended her personal religious beliefs.  She must allege facts demonstrating the challenged action created a burden on the exercise of her religion.").

23

engaging in activities in a place of worship when those activities are generally permitted throughout the State. That Plaintiffs "would like" to carry a firearm in order to be able to act in "self-defense" is a personal preference, motivated by a secular purpose. As we note supra, there is no First Amendment protection for personal preferences; nor is there protection for secular beliefs. United States v. DeWitt, 95 F.3d 1374, 1375 (8th Cir. 1996) ("Nevertheless, the Free Exercise Clause does not protect purely secular views or personal preferences." (citing Frazee v. Ill. Dep't of Emp't Sec., 489 U.S. at 833, 109 S. Ct. at 1517)). The allegations in the Amended Complaint, as Plaintiffs chose to frame their case, do not state a Free Exercise claim.[27]

In sum, conclusory allegations that the Carry Law interferes with Plaintiffs' free exercise of religion are not sufficient to survive a motion to dismiss. Their

---

[27] After arguing before the District Court on numerous occasions that they did not have to allege a constitutionally impermissible burden on a sincerely held religious belief, Plaintiffs chose to include additional facts with their motion for summary judgment. These additional facts do not appear in the Amended Complaint. It is well-settled in this circuit that a plaintiff may not amend the complaint through argument at the summary judgment phase of proceedings. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam) ("A plaintiff may not amend [his or her] complaint through argument in a brief opposing summary judgment."); see also Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1297 (11th Cir. 2006) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a)." (quoting Gilmour, 382 F.3d at 1315)).

Free Exercise claim is not plausible, see Iqbal, 556 U.S. —, 129 S. Ct. at 1949, and the District Court correctly dismissed it.[28]

IV.

We now consider Plaintiffs' Second Amendment claims, in Counts 3 and 4, that the Carry Law infringed on their right to bear arms. The Second Amendment reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court drastically changed the impact of the Second Amendment in the wake of two of its recent decisions: District of Columbia v. Heller[29] and McDonald v. City of Chicago.[30]

In Heller, the Court held for the first time that the Second Amendment "codified a pre-existing" individual right to keep and bear arms. 554 U.S. at 592, 128 S. Ct. at 2797. In so holding, the Court struck down a prohibition of the possession of operable handguns in one's home.[31] The Court reached its holding

---

[28] The District Court addressed, and dismissed, the Tabernacle's claim that the Carry Law impermissibly encroaches on its ability to manage its internal affairs. The Tabernacle failed to include in its brief on appeal an argument that the District Court erred in dismissing the claim. We therefore consider that argument abandoned.

[29] 554 U.S. 570, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008).

[30] — U.S. —, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010).

[31] The District of Columbia Code provision at issue in Heller prohibited handgun possession in two ways: the District of Columbia (1) required the registration of all firearms and

25

after an extensive discussion of the background of the Second Amendment at the time of drafting, reasoning that, while "self-defense had little to do with codification; it was the central component of the right itself." Id. at 599, 128 S. Ct. at 2801 (emphasis in original). The Court concluded that the District of Columbia's ban made it impossible to use a handgun for the "core lawful purpose of self-defense." Id. at 630, 128 S. Ct. at 2818. The Court went to great lengths to emphasize the special place that the home—an individual's private property—occupies in our society. See Heller, 554 U.S. at 628–29, 128 S. Ct. at 2817–18 (emphasizing that "the need for defense of self, family, and property is most acute" in the home and emphasizing the special role of handguns as "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family" (internal quotation marks omitted)). McDonald made the "Second Amendment binding on the States and their subdivisions," through the Due Process Clause of the Fourteenth Amendment. See McDonald, 130 S. Ct. 3046.[32]

prohibited the registration of handguns, and (2) enacted a ban on keeping an operable firearm—the law stated that a firearm must be kept "unloaded and disassembled or bound by a trigger lock or similar device." Heller, 554 U.S. at 630, 128 S. Ct. at 2818.

[32] Plaintiffs must establish that there is some type of state action at issue. The state action in this case is the enactment of the Carry Law and that statute's enforcement through the arrest, criminal prosecution, and conviction of an individual. See Hines v. Davidowitz, 312 U.S. 52, 80, 61 S. Ct. 399, 411, 85 L. Ed. 581 (1941) ("The Fourteenth Amendment guarantees the civil liberties of aliens as well as of citizens against infringement by state action in the enactment of laws and their administration as well."). A property owner who engages in self-help is not a state actor. See Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 157, 98 S. Ct. 1729, 56 L. Ed. 2d 185

In Counts 3 and 4 Plaintiffs allege that "[the Carry Law] infringes on the rights of Plaintiffs to keep and bear arms, in violation of the Second Amendment, by prohibiting them from possessing weapons in a place of worship." Am. Compl. at ¶¶ 45, 48. As with their First Amendment claims, Plaintiffs brought both a "direct action," in Count 3, and a § 1983 action, in Count 4. Many of the same pleading deficiencies of the Amended Complaint that we found in Plaintiffs' First Amendment claims (Counts 1 and 2) also plague their Second Amendment claims (Counts 3 and 4); we need not reiterate those problems.[33] Our inquiry boils down to whether Plaintiffs' § 1983 claim entitles them to declaratory relief against the Governor.

Plaintiffs frame their Second Amendment attack as both a facial and an as-applied challenge in a pre-enforcement review. We view the Second Amendment

---

(1978) (concluding that a private party's actions can be treated as state action only when the function performed is "traditionally exclusively reserved to the State." (internal quotation marks omitted)); White v. Scrivner Corp., 594 F.2d 140, 142 (5th Cir. 1979) (denying that private security personnel were acting under the color of state law in "detaining [plaintiffs] as suspected shoplifters, in searching their purses, and in detaining them after the gun was found, even though the defendants no longer had any reason to believe they were shoplifting" because the court reasoned that "[a] merchant's detention of persons suspected of stealing store property simply is not an action exclusively associated with the state. Experience teaches that the prime responsibility for protection of personal property remains with the individual." (emphasis added)). In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[33] For a review of these deficiencies, see the introduction to part III, supra.

27

challenge as essentially raising only a facial challenge.[34]  As we stated with respect to Plaintiffs' Free Exercise claim, Plaintiffs must show that the Carry Law is unconstitutional in all applications to prevail in their facial challenge.  See United States v. Salerno, 481 U.S. 739, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987).  One common application of the Carry Law would be when a license holder wants to carry a firearm in a place of worship where management of the place of worship

_____

[34]  We believe that the Amended Complaint fails to plead an as-applied Second Amendment challenge for the same reason we rejected the as-applied First Amendment challenge.  The Carry Law has not been applied to Plaintiffs, and they have not included sufficient allegations to show how the Carry Law would be applied in their specific case.  See supra note 20; Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1308 (11th Cir. 2009) ("'An as-applied challenge . . . addresses whether 'a statute is unconstitutional on the facts of a particular case or to a particular party.'  Because such a challenge asserts that a statute cannot be constitutionally applied in particular circumstances, it necessarily requires the development of a factual record for the court to consider.").  As a result, we view Plaintiffs as challenging the Carry Law as void on its face only.

Like our sister circuits, we believe a two-step inquiry is appropriate: first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we would apply the appropriate level of scrutiny.  See Heller v. District of Columbia, 670 F.3d 1244, 1252 (D.C. Cir. 2011) (adopting two-step inquiry); Ezell v. City of Chicago, 651 F.3d 684, 701–04 (7th Cir. 2011) (noting that "the threshold inquiry in some Second Amendment cases will be a 'scope' question: Is the restricted activity protected by the Second Amendment in the first place," and then moving to a second step, if necessary, applying the appropriate level of scrutiny); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010) (noting that "a two-part approach to Second Amendment claims seems appropriate under Heller," requiring first a determination that the law at issue imposes a burden on conduct falling within the scope of the Second Amendment, and then applying the requisite level of scrutiny); United States v. Reese, 627 F.3d 792, 800–01 (10th Cir. 2010) (adopting a similar two-step analytical framework); United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010) (adopting a two-pronged approach where "[f]irst, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.  If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny.").  In this case, we need only reach the first step.  In reaching this conclusion, we obviously need not, and do not, decide what level of scrutiny should be applied, nor do we decide whether a place of worship is a "sensitive place" under Heller, 554 U.S. at 626, 128 S. Ct. at 2817.

prohibits carrying. To state a facial challenge, therefore, Plaintiffs must take the position that the Second Amendment protects a right to bring a firearm on the private property of another against the wishes of the owner. Put another way, Plaintiffs must argue that the individual right protected by the Second Amendment, in light of Heller and McDonald, trumps a private property owner's right to exclusively control who, and under what circumstances, is allowed on his or her own premises.[35] In short, we read Plaintiffs' claim to assume the following: management of a place of worship is likely to bar license holders from carrying an unsecured firearm on the premises; the license holders are unlikely to comply with management's instructions; management is likely to report such conduct to law enforcement; the license holders are likely to be arrested by for their refusal to comply with management's instructions; and the arrest establishes a Second Amendment violation.[36]

Heller commands that, in passing on a Second Amendment claim, courts must read the challenged statute in light of the historical background of the

---

[35] There is nothing in the record that would allow us to draw a conclusion that the Tabernacle is anything other than a purely private religious organization that owns property in its non-profit corporation legal form. We proceed under this assumption.

[36] The plain language of the Carry Law belies any argument that all firearms are per se prohibited from a place of worship; quite simply, this is not the "ban" that Plaintiffs make it out to be. Appellants' Br. at 14.

29

Second Amendment.  See 554 U.S. at 592, 128 S. Ct. at 2797 ("We look to [the historical background of the Second Amendment] because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right.  The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" (emphasis omitted)).  Because a place of worship is private property, not public property, it is particularly important that we understand the individual right to bear arms in light of the historical background of criminal law, tort law, and property law; for that body of law establishes the rights of private property owners.  In subpart A, we describe this historical background.  In subpart B, we identify the scope of any pre-existing right to bear arms on the private property of another.

A.

We begin our review by describing the historical background of the Second Amendment.

In the Commentaries on the Laws of England, William Blackstone described a private property owner's right to exclusive control over his or her own property as a "sacred and inviolable right[]."  1 William Blackstone, Commentaries *140.  Blackstone wrote,

30

There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property; or that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe.

2 id. *2. Blackstone also discussed how a license holder who enters private property does not have the same rights as a property owner. See id. (emphasizing that the right of a property owner is in "total exclusion of the right of any other individual in the universe"). In other words, a guest is able to enter or stay on private property only with the owner's permission. A guest is removable at the owner's discretion.[37]

Turning to common law tort principles, if a person enters upon the land of another without the owner's permission or if a person remains on the land against the owner's wishes, then the person becomes a trespasser. At common law, this status implicated the law of torts—allowing the owner to initiate a civil action

---

[37] As a matter of reference, it is worth pointing out that Georgia adopted this position. Since at least the nineteenth century, Georgia courts have expressly recognized that property owners possess a right to exclude others from one's private land. See Fluker v. Ga. R.R. & Banking Co., 8 S.E. 529, 530 (Ga. 1889) (noting that "the very nature of property involves a right of exclusive dominion over it in the owner."); see also Navajo Constr. v. Brigham, 608 S.E.2d 732, 733 (Ga. App. 2004) (stating that a private property owner "has the right 'to possess, use, enjoy, and dispose of it, and the corresponding right to exclude others from [its] use.'" (quoting Woodside v. City of Atlanta, 103 S.E.2d 108, 115 (Ga. 1958)). These principles are reflected in the Carry Law. See O.C.G.A. § 16-11-127(c) (noting that "private property owners or persons in legal control of property through a lease, rental agreement, licensing agreement, contract, or any other agreement to control access to such property" may forbid the possession of a weapon).

31

against the trespasser.  See 2 Frederick Pollock & Frederic William Maitland, The History of English Law 41 (Legal Classic Library special ed. 1982) (2d ed. 1899) (noting that one should look to "the law of crimes" and "the law of torts and civil injuries").[38]  Blackstone elaborated on the private wrong of trespass:

> But in the limited and confined sense, in which we are at present to consider [the wrong of trespass], it signifies no more than an entry on another man's ground without a lawful authority, and doing some damage, however inconsiderable, to his real property.  For the right of meum and tuum, or property, in lands being once established, it follows as a necessary consequence, that this right must be exclusive; that is, that the owner may retain to himself the sole use and occupation of his soil: every entry therefore thereon without the owner's leave, and especially if contrary to his express order, is a trespass or transgression.

---

[38]  Prosser and Keeton similarly embraces the exclusive right of a property owner:

The possessor of land has a legally protected interest in the exclusiveness of his possession.  In general, no one has any right to enter without his consent, and he is free to fix the terms on which that consent will be given.  Intruders who come without his permission have no right to demand that he provide them with a safe place to trespass, or that he protect them in their wrongful use of his property.

W. Page Keeton et al., Prosser and Keeton on Torts § 58, at 393 (5th ed. 1984).

3 William Blackstone, Commentaries *209.[39]  Implied in this private action, as

Blackstone explained it, is an exclusive right of an owner to eject an individual

from the owner's property and initiate a civil trespass action.[40]

---

[39]  We also note that an owner may be subject to civil liability for their failure to protect guests from harm.  For example, depending on the place of worship's knowledge of particular risks posed by a license holder, the place of worship may be subject to tort liability if it fails to take sufficient precautions to ensure that the other worshipers in attendance are not endangered.  The movement to impose liability on land owners—and thereby give some legal rights, even if minimal, to persons entering another's land—slowly gained steam both in England and in the United States throughout the seventeenth, eighteenth, and early nineteenth centuries.  See 2 Edward Coke, Institutes of the Laws of England *316 (recognizing, in treatises first published from 1628 to 1644, that a tort action could lie against a landowner who used excessive force to repel a trespasser); see also Townsend v. Wathen, (1808) 103 Eng. Rep. 579 (K.B.) (recognizing that a landowner who set a trap that injured an entrant's animal on his or her property could be held liable); Bird v. Holbrook, (1828) 130 Eng. Rep. 911 (C.P.) (holding that an owner who left a spring gun to injure a trespasser could be held liable).  The common law eventually evolved into a three-tiered framework: individuals were classified as either an invitee, a licensee, or a trespasser.  The landowner owed a duty that corresponded to the individual's classification.  Over time, some states have moved away from these common law rules; it is safe to say, though, that currently all states impose certain duties on a property owner (or its lessee).  Georgia courts have consistently held that a private property owner owes a duty of care to those on its property pursuant to an "express or implied invitation" and to "licensees," see O.C.G.A. §§ 51–3–1 to 51–3–2, and that this duty includes a legal obligation to protect such persons from the foreseeable dangers posed by other invitees or licensees.  See Moon v. Homeowners' Ass'n of Sibley Forest, Inc., 415 S.E.2d 654, 657 (Ga. App. 1992) ("'An owner of premises is liable to a guest . . . when the owner has reason to anticipate the misconduct of the guest inflicting the injury.'" (alteration in original) (quoting Veterans Org. of Fort Oglethorpe v. Potter, 141 S.E.2d 230, 233 (Ga. App. 1965))).

[40]  Likewise, Georgia has long recognized a private action for trespass.  See O.C.G.A. § 51-9-1 ("The right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie."); Neal v. Haygood, 1 Kelly 514, 1846 WL 1205 at *2 (Ga. 1846) ("Where the cause of action is a tort, or arises, ex delicto, supposed to be by force and against the king's peace, then the action dies; as battery, false imprisonment, trespass, words, &c., escape against the sheriff, and many others of the same kind." (internal quotation marks omitted)).

In addition, criminal law principles drawn from the common law reinforce the fundamental nature of a property owner's rights.  In The History of English Law, Frederick Pollock & Frederic William Maitland note:

> In the first place, the protection given to possession may be merely a provision for the better maintenance of peace and quiet.  It is a prohibition of self-help in the interest of public order.  The possessor is protected, not on account of any merits of his, but because the peace must be kept; to allow men to make forcible entries on land or to seize goods without form of law, is to invite violence.

2 Pollock & Maitland, supra, at 41.  Blackstone reiterates this position, describing trespass as an "offence against the public peace."  4 William Blackstone, Commentaries *147 (emphasis added).  The criminal offense of trespass, as set forth in several ancient statutes, included "any forcible entry, or forcible detainer after peaceable entry, into any lands."  Id.  Pollack and Maitland offer a similar view: "[T]here will be a trespass with force and arms if a man's body, goods or land have been unlawfully touched."  2 Pollock & Maitland, supra, at 526.[41]

---

[41]  We note that Georgia has adopted these common law principles as cornerstone tenets of its criminal code.  To wit, the Georgia Code provides that

> A person commits the offense of criminal trespass when he or she knowingly and without authority:
>
>> (1) Enters upon the land or premises of another person . . . for an unlawful purpose; [or]
>> . . .
>> (3) Remains upon the land or premises of another person . . . after receiving notice from the owner, rightful occupant, or, upon proper

34

B.

Thus, property law, tort law, and criminal law provide the canvas on which our Founding Fathers drafted the Second Amendment. A clear grasp of this background illustrates that the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place of worship against the owner's wishes. Quite simply, there is no constitutional infirmity when a private property owner exercises his, her, or its—in the case of a place of worship—right to control who may enter, and whether that invited guest can be armed and the State vindicates that right. This situation, being a likely application of the Carry Law, illustrates that Plaintiffs cannot show that all or most applications of the Carry Law are unconstitutional. See United States v. Salerno, 481 U.S. 739, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987).

A place of worship's right, rooted in the common law, to forbid possession of firearms on its property is entirely consistent with the Second Amendment. Surely, given the Court's pronouncement that the Second Amendment merely "codified a pre-existing right," Plaintiffs cannot contend that the Second

---

identification, an authorized representative of the owner or rightful occupant to depart.

O.C.G.A. § 16-7-21(b)(3).

Amendment in any way abrogated the well established property law, tort law, and criminal law that embodies a private property owner's exclusive right to be king of his own castle. By codifying a pre-existing right, the Second Amendment did not expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights; rather, the Second Amendment merely preserved the status quo of the right that existed at the time.[42] Indeed, numerous colonial leaders, as well as scholars whose work influenced the Founding Fathers, embraced the concept that a man's (or woman's) right to control his (or her) own private property occupied a special role in American society and in our freedom. See William Tudor, Life of James Otis 66–67 (1823) (quoting a speech from 1761 given by James Otis, who stated that "one of the most essential branches of English liberty is the freedom of one's house. A man's house is his castle."); John

---

[42] We acknowledge that certain colonies, including Georgia, enacted laws requiring the possession of firearms in a place of worship at one point or another. The Georgia statute read as follows: "WHEREAS it is necessary for the security and defence of this province from internal dangers and insurrections, that all persons resorting to places of worship shall be obliged to carry fire arms." 19 Allen D. Candler, The Colonial Records of the State of Georgia 137–140 (1910). Based on the language of Georgia's statute, the primary motivation for requiring attendance at a place of worship with a firearm was likely a practical one; that is, the colonial government identified a time when much of the community would be gathered in one location—each Sunday at a place of worship for services—to ensure that individuals both possessed the equipment necessary for defense and kept it in a state of readiness should their services be called upon to defend the community against an internal or external threat. That a statute such as this one appeared on the books of several colonies at various times does not indicate that the Second Amendment enshrined a constitutional right to preempt the wishes of a place of worship in order to carry unsecured firearms in contravention of an owner's wishes.

36

Locke, Two Treatises on Government, 209–10 (1821) ("[Property] being by him removed from the common state nature hath placed it in, it hath by this labour something annexed to it, that excludes the common right of other men.").

An individual's right to bear arms as enshrined in the Second Amendment, whatever its full scope, certainly must be limited by the equally fundamental right of a private property owner to exercise exclusive dominion and control over its land.  The Founding Fathers placed the right to private property upon the highest of pedestals, standing side by side with the right to personal security that underscores the Second Amendment.  As Blackstone observed,

> [T]hese [fundamental rights] may be reduced to three principal or primary articles; the right of personal security, the right of personal liberty; and the right of private property: because as there is no other known method of compulsion, or of abridging man's natural free will, but by an infringement or diminution of one or other of these important rights, the preservation of these, inviolate, may justly be said to include the preservation of our civil immunities in their largest and most extensive sense.

1 William Blackstone, Commentaries *129.

Blackstone talks not of sacrificing one of the "principal or primary" rights for another, but rather of "preservation of these, inviolate."  Id.  (emphasis added). He concludes that all of the three fundamental rights of personal security, personal liberty, and private property can, and must, coexist together to fully protect civil

37

liberties.  Id.  It is simply beyond rational dispute that the Founding Fathers, through the Constitution and the Bill of Rights, sought to protect the fundamental right of private property, not to eviscerate it.  See John Adams, Defence of the Constitutions of Government of the United States (1787), reprinted in 6 John Adams, The Works of John Adams, 3, 9 (Charles Francis Adams ed., 1851) ("The moment the idea is admitted into society that property is not as sacred as the laws of God, and that there is not a force of law and public justice to protect it, anarchy and tyranny commence."); James Madison, Property (1792), reprinted in 6 The Writings of James Madison 101, 102 (Gaillard Hunt ed., 1906) ("Government is instituted to protect property of every sort; as well that which lies in the various rights of individuals, as that which the term particularly expresses.  This being the end of government, that alone is a just government which impartially secures to every man whatever is his own." (emphasis in original)); Thomas Paine, Essay dated December 23, 1776, reprinted in Thomas Paine, The Crisis 8 (2009 ed.) (1776) ("[I]f a thief breaks into my house, burns and destroys my property, and kills or threatens to kill me, or those that are in it, and to "bind me in all cases whatsoever" to his absolute will, am I to suffer it? What signifies it to me, whether he who does it is a king or a common man; my countryman or not my countryman; whether it be done by an individual villain, or an army of them?  If we reason to

38

the root of things we shall find no difference; neither can any just cause be assigned why we should punish in the one case and pardon in the other.").

Plaintiffs, in essence, ask us to turn Heller on its head by interpreting the Second Amendment to destroy one cornerstone of liberty—the right to enjoy one's private property—in order to expand another—the right to bear arms.  This we will not do.  If, as Blackstone argues, our concept of civil liberties depends on a three-legged stool of rights—personal security, personal liberty, and private property—it would be unwise indeed to cut off one leg entirely only to slightly augment another.  Rather, our task is to read the Second Amendment's pre-existing right alongside the equally important rights protected by the Constitution in order to strengthen all three legs and thereby better secure the foundation of our liberty.  When the Second Amendment is understood in its proper historical context, it becomes readily apparent that the Amendment codified a pre-existing right that was circumscribed by the common law rights of an owner under property law, tort law, and criminal law.  Heller's expounding of the pre-existing right enshrined in the Second Amendment does nothing to change this.

In sum, to the extent Plaintiffs' argument implies that the Second Amendment—in light of the Court's decisions in Heller and McDonald—somehow abrogates the right of a private property owner—here, a

39

place of worship—to determine for itself whether to allow firearms on its premises and, if so, under what circumstances, the argument badly misses the mark. We conclude that the Second Amendment does not give an individual a right to carry a firearm on a place of worship's premises against the owner's wishes because such right did not pre-exist the Amendment's adoption. Enforcing the Carry Law against a license holder who carries a firearm on private property against the owner's instructions would therefore be constitutional. Plaintiffs' facial challenge fails because the Carry Law is capable of numerous constitutional applications. See Salerno, 481 U.S. at 745, 107 S. Ct. at 2100.

V.

For the foregoing reasons, we AFFIRM the District Court's Rule 12(b)(6) dismissal of Counts 1 through 4 of the Amended Complaint.

SO ORDERED.