PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-4284

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SAMUEL ROBERT HOSFORD,

Defendant – Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, Senior District Judge. (8:13-cr-00550-DKC-1)

Argued: September 23, 2016          Decided: December 6, 2016

Before GREGORY, Chief Judge, and WILKINSON and DIAZ, Circuit Judges.

Affirmed by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Wilkinson and Judge Diaz joined.

**ARGUED**: Julie L.B. Stelzig, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Dana Jill Brusca, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF**: James Wyda, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Baltimore, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

GREGORY, Chief Judge:

In 2013, Mr. Samuel Hosford was indicted under 18 U.S.C. § 922 for unlicensed dealing in firearms and conspiracy to deal firearms without a license. He moved to dismiss the indictment on constitutional grounds. Specifically, he argued that the indictment violated his Second Amendment right to engage in intrastate firearm sales between non-prohibited persons; the Due Process Clause of the Fifth Amendment for vagueness; and the Commerce Clause. The district court denied his motion, and Hosford timely appealed.

"We review the district court's factual findings on a motion to dismiss an indictment for clear error, but we review its legal conclusions de novo." United States v. Perry, 757 F.3d 166, 171 (4th Cir. 2014) (quoting United States v. Woolfolk, 399 F.3d 590, 594 (4th Cir. 2005)). We hold that the prohibition against unlicensed firearm dealing comports with the Second and Fifth Amendments both facially and as applied. It is also a valid exercise of congressional power under the Commerce Clause. Accordingly, we affirm the district court's denial of Hosford's motion to dismiss his indictment.

I.

Hosford, a resident of Montgomery County, Maryland, sold firearms to an individual he met in a public parking lot five times over the course of two-and-a-half months. He had no reason to believe that the individual was a prohibited purchaser, but he also took no measures to ensure that the individual was a valid purchaser. Unbeknownst to him, the individual was an undercover officer. Hosford was arrested and indicted for one count of conspiracy and five counts of unlicensed firearm dealing.

According to the facts agreed to in his conditional plea agreement, Hosford conspired with another man, Henry Parrott, to sell firearms. Parrott purchased firearms from gun shows and delivered them to Hosford. Hosford then sold these firearms to the undercover officer. Over five transactions, Hosford sold the officer eight guns and intended to sell another four guns before he was arrested.

Hosford moved to dismiss his indictment as unconstitutional under the Second Amendment, Due Process Clause of the Fifth Amendment, and Commerce Clause. The district court held that the indictment was constitutional. Hosford then pleaded guilty, conditioned on the outcome of this appeal about the statute's constitutionality.

Hosford was indicted under the Gun Control Act of 1968, 18 U.S.C. § 921 et seq., which prohibits individuals without a license from regularly selling, for the predominant purpose of gaining profit, firearms that are not part of their personal collection or for their hobby. Because Hosford's motion challenges on Second Amendment and vagueness grounds the constitutionality of this prohibition, we first more carefully review the statutes at issue, as well as the burdens and responsibilities they trigger.

18 U.S.C. § 922 forbids anyone "except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms." 18 U.S.C. § 922(a)(1)(A).

18 U.S.C. § 921 lays out the relevant definitions for this prohibition. A dealer is, in relevant part, "any person engaged in the business of selling firearms at wholesale or retail." 18 U.S.C. § 921(11)(A). A licensed dealer is a dealer who has obtained a federal license to commercially buy and sell firearms. Id. And under clarifying statutory definitions passed in 1986, "[e]ngaged in the business" means "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective

of livelihood and profit through the repetitive purchase and resale of firearms." 18 U.S.C. § 921(21)(C); see also Firearm Owners Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986). And "with the principal objective of livelihood and profit" means that the intent of the sale "is predominantly one of obtaining livelihood and pecuniary gain," as opposed to other intents like decreasing or increasing one's personal firearm collection. 18 U.S.C. § 921(22). But these definitions explicitly exempt anyone "who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(21)(C).

To obtain a license, a prospective firearms dealer must submit an application, be at least twenty-one years old, pay a fee, and establish lawful premises for selling firearms. 18 U.S.C. § 923(a), (d). If the applicant fulfills these steps and is otherwise legally able to possess, transport, and ship firearms, the application must be approved. 18 U.S.C. § 923(d).

Licensed dealers are subject to regulations that those conducting personal sales are not. For example, the Attorney General may require licensed dealers to maintain importation, production, shipment, and other kinds of records, 18 U.S.C. § 923(g)(1)(A), and may inspect a dealer's inventory or records

5

without reasonable cause for a warrant, subject to other limitations, 18 U.S.C. § 923(g)(1)(B).

## III.

We first review Hosford's Second Amendment challenges. "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. For centuries, the Second Amendment received minimal judicial interpretation.

Then, in District of Columbia v. Heller, 554 U.S. 570 (2008), the Supreme Court determined that the Second Amendment protects an individual "right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 635. The Court held unconstitutional the District of Columbia's ban on possession of handguns in the home and its requirement that all firearms in the home be stored in a manner that rendered them inoperable for immediate self-defense. Id.

But the Court underscored that Heller was not meant "to clarify the entire field" of Second Amendment jurisprudence. Id. It further emphasized that Heller should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and

6

government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27. In a footnote, the Court identified these kinds of prohibitions as "presumptively lawful regulatory measures." Id. at 627 n.26.

Since Heller, courts have endeavored to establish what conduct the Second Amendment protects and what burdens on that conduct are constitutionally justifiable. The Fourth Circuit has adopted a two-pronged inquiry for Second Amendment challenges. First, the court must ask "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010) (quoting United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010)). If it does not, then the law comports with the Second Amendment. But if the challenged regulation does burden conduct within the scope of the Second Amendment as historically understood, the court must apply "an appropriate form of means-end scrutiny." Id. at 680.

Against this backdrop, Hosford raises both facial and as-applied Second Amendment challenges to the prohibition against unlicensed firearm dealing. We consider each in turn.

A.

We first examine Hosford's facial challenge. To succeed in a facial constitutional challenge, a movant "must establish that

7

no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). Because of this stringent standard, a facial challenge is perhaps "the most difficult challenge to mount successfully." Id. And while courts generally engage in the above-mentioned two-pronged analysis for facial Second Amendment challenges, our precedent simplifies that analysis for prohibitions deemed "presumptively lawful" in Heller.

In United States v. Moore, 666 F.3d 313 (4th Cir. 2012), this Court found the federal prohibition against possession of firearms by felons facially constitutional because it was identified in Heller as presumptively lawful. Id. at 318-19. According to this Court, the Supreme Court's identification of "longstanding prohibitions on the possession of firearms by felons" as presumptively lawful "streamlined" the otherwise-applicable two-pronged analysis. Id. at 317-18. "It is unclear to us whether Heller was suggesting that 'longstanding prohibitions' such as these . . . were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason." Id. at 318 (quoting Chester, 628 F.3d at 679); see also Marzzarella, 614 F.3d at 91. But either reasoning demonstrated that these presumptively lawful prohibitions were facially constitutional,

8

because they could be constitutionally applied. <u>Moore</u>, 666 F.3d at 318-19.

The same reasoning applies here. Hosford's facial challenge fails if the prohibition against unlicensed firearm dealing is the type of regulation deemed "presumptively lawful" in <u>Heller</u>. There may be debate as to whether the Supreme Court called presumptively lawful all "laws imposing conditions and qualifications on the commercial sale of arms," or only "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms." <u>Heller</u>, 554 U.S. at 626-27. But we need not parse that language here: the prohibition against unlicensed firearm dealing is a longstanding condition or qualification on the commercial sale of arms and is thus facially constitutional.

First, the regulation covers only the commercial sale of firearms. It affects only those who regularly sell firearms, not owned for personal use, in the course of trade or business for the principal purpose of profit. It explicitly excludes the vast majority of noncommercial sales, such as sales from one's own personal collection, sales meant to enhance one's hobby, and infrequent sales or exchanges.

Second, the regulation imposes a mere condition or qualification. Though framed as a prohibition against

9

unlicensed firearm dealing, the law is in fact a requirement that those who engage in the commercial sale of firearms obtain a license. A prospective dealer who wishes to obtain a license need only submit an application, be at least twenty-one years old, pay a fee, and establish lawful premises for selling firearms. 18 U.S.C. § 923(a), (d). Neither the application procedure nor the fee are so prohibitive as to turn this condition or qualification into a functional prohibition. Cf. Ill. Ass'n of Firearms Retailers v. City of Chicago, 961 F. Supp. 2d 928, 938-939 (N.D. Ill. 2014) (finding that city ordinances allowing firearm sales and transfers only outside city limits were a functional ban on firearm acquisition); Teixeira v. County of Alameda, 822 F.3d 1047 (9th Cir. 2016) (noting that if no unincorporated area of county qualifies under zoning requirement that firearm retailers must be 500 feet from certain establishments, zoning requirement may be functional ban on firearm stores).

And lastly, this prohibition against unlicensed firearm dealing is longstanding. Federal appellate courts have only recently begun to establish how old a firearm regulation must be to be longstanding. And no court has previously examined whether the prohibition at issue here is longstanding. But a review of similar cases establishes that the prohibition against

10

unlicensed firearm dealing is of similar age to other longstanding firearm regulations, and is thus also longstanding.

The Third Circuit found New Jersey's permit requirement for possessing handguns "longstanding"; New Jersey established its permit requirement in 1966 and first required permits for only concealable handguns in 1924. Drake v. Filko, 724 F.3d 426, 432 (3d Cir. 2013). The D.C. Circuit noted that the U.S. Supreme Court found prohibitions on the possession of firearms by felons to be longstanding "although states did not start to enact th[ose prohibitions] until the early 20th century." Heller v. District of Columbia, 670 F.3d 1244, 1253 (D.C. Cir. 2011); see also C. Kevin Marshall, Why Can't Martha Stewart Have A Gun?, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009) (noting that bans on possession of firearms by felons not passed in any state other than New York until 1923, and not passed in states with constitutional right-to-arms provisions until 1925). And the D.C. Circuit found that Washington, D.C.'s handgun-registration requirement, first passed in 1975, was longstanding, even though some states first regulated the possession of handguns in 1927 or 1932, and those laws required less of the purchaser. See Heller, 670 F.3d at 1254; see also, e.g., 47 Stat. 650, 652 (1932) (requiring purchasers of pistols in District of Columbia

11

to give seller basic personal identifying information); 1927 Haw. Sess. Laws 209, 211 (same).

Licensing requirements for dealers have been around for as long as these laws, if not longer. The federal government first required dealers to obtain licenses in 1938, nearly eighty years ago. Federal Firearms Act, Pub. L. No. 75-785, 52 Stat. 1250, 1250 (1938) (repealed 1968) (replaced with Gun Control Act of 1968, Pub. L. 90-618, 82 Stat. 1213). And some states required licenses for dealers even earlier.[1] Thus, the federal progenitor of the law at issue was passed decades before the handgun-licensing requirements examined by the Third Circuit and D.C. Circuit. And licensing requirements on dealers have existed at least as long as regulations on the possession of handguns.

For these reasons, the prohibition against unlicensed firearm dealing is a longstanding condition or qualification on the commercial sale of firearms. As a result, Hosford's facial Second Amendment challenge fails.

B.

Even if a statute is facially constitutional, "the phrase 'presumptively lawful regulatory measures' suggests the

---

[1] See, e.g., 47 Stat. 650, 652 (1932) (District of Columbia established licensing requirement in 1932); 1927 Haw. Sess. Laws 209, 211 (Hawaii established licensing requirement in 1927).

12

possibility that one or more of these 'longstanding' regulations 'could be unconstitutional in the face of an as-applied challenge." Chester, 628 F.3d at 679 (quoting United States v. Williams, 616 F.3d 685, 692 (7th Cir. 2010)). We thus now turn to Hosford's as-applied challenge.

As stated above, this Court has established a two-pronged analysis for Second Amendment challenges: "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," and if so, whether the challenged law survives "an appropriate form of means-end scrutiny." Chester, 628 F.3d at 680. But even when applying this analysis, we are at liberty to assume that a challenged statute burdens conduct protected by the Second Amendment and focus instead on whether the burden is constitutionally justifiable. Woollard v. Gallagher, 712 F.3d 865, 875 (4th Cir. 2013) ("[W]e are not obliged to impart a definitive ruling at the first step of the Chester inquiry. And indeed, we and other courts of appeals have sometimes deemed it prudent to instead resolve post-Heller challenges to firearm prohibitions at the second step"). Because we can resolve the statute's constitutionality on the inquiry's second prong, we also find it prudent in this case to assume, without holding, that the

13

federal prohibition against unlicensed firearm dealing burdens conduct protected by the Second Amendment.

1.

We first must determine what level of scrutiny applies. The right to bear arms, after all, "is not unlimited." Heller, 554 U.S. at 626. Even as historically and traditionally understood, law-abiding citizens do not have the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Id.

In United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011), this Court held that laws burdening "core" Second Amendment conduct receive strict scrutiny, while less severe burdens receive only intermediate scrutiny. Id. at 471. We noted that core Second Amendment conduct includes the "fundamental right to possess firearms for self-defense within the home. But a considerable degree of uncertainty remains as to the scope of that right beyond the home . . . ." Id. at 467. "[A]s we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self defense." Id. at 470. Thus, "less severe burdens on the right, laws that merely regulate rather than restrict, and laws that do not implicate the central self-

14

defense concern of the Second Amendment, may be more easily justified." Id. at 470 (quoting Chester, 628 F.3d at 682).

Here, even assuming that the prohibition implicates conduct protected by the Second Amendment, the prohibition does not touch on the Second Amendment's core protections. Individuals remain free to possess firearms for self-defense. Individuals also remain free to purchase or sell firearms owned for personal, self-defensive use. The law merely imposes a licensing requirement on those who wish to profit by regularly selling firearms outside of their personal collection; it serves, not as a prohibition, but as a condition or qualification. The law, therefore, regulates rather than restricts, addresses only conduct occurring outside the home, and does not touch on self-defense concerns. It is thus subject to intermediate scrutiny.

2.

To satisfy intermediate scrutiny, the government must show that "there is a 'reasonable fit' between the challenged regulation and a 'substantial' government objective." Chester, 628 F.3d at 683 (quoting Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989)).

The government enacted the prohibition against unlicensed firearm dealing, alongside myriad other firearm regulations,

15

because "the ease with which firearms could be obtained contributed significantly to the prevalence of lawlessness and violent crime in the United States." Huddleston v. United States, 415 U.S. 814, 824 (1974) (citing S. Rep. No. 90-1097, at 2198 (1968)). The government's interest is, therefore, "to c[ur]b crime by keeping 'firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.'" Id.

Such interests in public safety and preventing crime are indisputably substantial governmental interests. See Woollard, 712 F.3d at 877. The question then is whether there is a reasonable fit between the prohibition against unlicensed firearm dealing and the government's objectives.

The requirement that firearm dealers——those who regularly engage in the business of selling firearms——obtain licenses is a crucial part of the federal firearm regulatory scheme. Licensed dealers are subject to more stringent regulations and governmental oversight than private sellers. See 18 U.S.C. § 923(g)(1). By subjecting firearm dealers to routine inspections, which require neither a warrant nor probable cause, the government has more opportunities to ensure compliance with laws that have demonstrated effects on reducing gun violence.

16

For example, prohibiting those under a restraining order for domestic violence from possessing firearms correlates to a statistically significant decrease in intimate partner homicides. See Elizabeth R. Vigdor & James A. Mercy, Do Laws Restricting Access to Firearms By Domestic Violence Offenders Prevent Intimate Partner Homicide?, 30 Eval. Rev. 313, 332 (2006). And restricting these individuals' access to firearms by prohibiting their purchase of firearms, rather than merely their possession, is significantly more effective. Id. at 333. Requiring sellers to conduct background checks, as licensed firearms dealers must do under federal law, also significantly reduces prohibited purchasers' access to firearms. See Katherine A. Vittes et al., Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership, 19 Injury Prevention 26, 29 (2013). Indeed, of those studied, very few offenders purchased a weapon from a federal firearms dealer, in large part because of the background-check requirement. Id. at 30. Without a prohibition against the unlicensed dealing of firearms, individuals who regularly engage in the business of selling firearms for profit would have no incentive to obtain a license and subject themselves to these requirements.

17

Despite Hosford's protestations, this prohibition against the unlicensed dealing of firearms is not "a broad prohibition, applying to the entire law-abiding population, that substantially burdens conduct that goes to the core of rights secured under the Second Amendment." Appellant Br. at 29. Nor does this prohibition impermissibly implicate "the right of a non-prohibited person to engage in the private, intrastate sale of firearms to another non-prohibited person," even assuming such a right is countenanced in the Second Amendment's core protections. Appellant Br. at 12. Individuals are free to sell firearms from their personal collection, to sell firearms only occasionally, and to sell firearms commercially with a license. This prohibition is a narrowly delineated, reasonable fit to further Congress's important objectives in public safety and crime prevention: it affects only those select individuals who regularly sell firearms they do not personally own in their collection or for their hobby, for the principle purpose of accruing profit. And it is a necessary component to the effectiveness of federal firearm regulations.

Moreover, nothing about Hosford's situation changes this analysis as applied to him. Over the course of five separate occasions, he sold to an unknown individual nearly a dozen firearms that he purchased hours before. A grand jury indicted

18

Hosford for the unlawful, regular sale of firearms for the principal purpose of profit, where the firearms were not part of his personal collection or for his hobby. And Hosford does not contest that his conduct violated the statute.

Applying the federal prohibition to Hosford affects no "core" constitutional right, so applying only intermediate scrutiny remains appropriate. His brief possession of the firearms he sold had no connection to the long-held right to self-defense; he did not purchase or own them for that purpose. His indictment does not implicate his right to keep firearms in his home. Indeed, any attempt to characterize Mr. Hosford's conduct as "core" Second Amendment conduct, thus deserving of higher scrutiny, goes merely to whether Mr. Hosford was guilty of the crime. If he were a hobbyist, sold firearms only occasionally, or sold firearms from his personal collection, he may argue—assuming he were even indicted—that his core Second Amendment conduct was implicated. But that hypothetical scenario is not at issue here.

And in applying intermediate scrutiny, the government's interests in the law generally also justify applying the law to Hosford. Hosford sold firearms on multiple occasions to an individual whom, as far as the record shows, he did not vet. He kept no record of the firearms he sold. He conducted no

19

background check. He did not know whether the buyer was prohibited, and took no steps to ensure that the buyer could legally purchase firearms. His actions are the exact kind of unlicensed firearm dealing that Congress feared when passing the licensing requirement as an attempt to stymie the unregulated flow of firearms to prohibited purchasers. For these reasons, Hosford's as-applied Second Amendment challenge also fails.

IV.

Hosford next argues that the federal prohibition against unlicensed firearm dealing is void for vagueness, both facially and as applied. "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983).

Yet "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." Holder v. Humanitarian Law Project, 561 U.S. 1, 18-19 (2010) (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982)). Thus, if a law clearly prohibits a defendant's

20

conduct, the defendant cannot challenge, and a court cannot examine, whether the law may be vague for other hypothetical defendants. Because the prohibition against unlicensed firearm dealing is not vague as applied to Hosford, both his as-applied and facial challenges fail.[2]

In 1975, this Court upheld the pre-1986, less specific prohibition against unlicensed firearm dealing. United States v. Huffman, 518 F.2d 80 (4th Cir. 1975) (per curiam).[3] At the time, the statute prohibited individuals from "engag[ing] in the business of selling firearms or ammunition at wholesale or retail," but did not define what "business" meant. See id. at 81. The defendant "engaged in more than a dozen transactions in the course of a few months. He frequently built firearms, or had them rebuilt, and exchanged them for other weapons which he subsequently sold or traded. There was also evidence that he

---

[2] Hosford argues that his facial vagueness challenge should be heard even if the claim is not vague as applied to him, because the statute may nonetheless "chill constitutionally-protected activity." Appellant Br. at 40. But his argument confuses a due-process vagueness challenge with a First Amendment overbreadth challenge. Because Hosford has not alleged an overbreadth claim, we decline to address it.

[3] Hosford alleges that Huffman is not persuasive because it was decided pre-Heller. But Heller's recognition of an individual right to keep and bear arms has no bearing on whether a statute is vague as a matter of due process.

traded large quantities of military ammunition for firearms." Id. This Court held that the statute was not vague as applied to the defendant. Id.

Here, the prohibition against unlicensed firearm dealing is much narrower and clearer: it regulates only individuals who regularly sell, for the principal purpose of accruing profit or maintaining a livelihood, firearms that are not part of their personal collection or for their hobby. And like the defendant in Huffman, Hosford engaged in transactions that resulted in the sale or attempted sale of a dozen weapons over the course of a few months. Indeed, Hosford's conduct may be even more clearly commercial than that of the defendant in Huffman. In Huffman, the defendant both traded and built firearms, which could possibly imply that he had a hobby; Hosford resold for profit weapons he purchased a few hours earlier. Thus, applying the narrower and more clarifying statute to Hosford's similarly commercial sale of firearms is not unconstitutionally vague.

Hosford argues that the statute is unclear as to whether someone is a "dealer" or "collector," and whether someone sells the guns for profit or as a mere hobby. Appellant Br. at 48. But statutes necessarily have some ambiguity, as no standard can be distilled to a purely objective, completely predictable standard. "[T]he law is full of instances where a man's fate

22

depends on his estimating rightly . . . some matter of degree." Johnson v. United States, 135 S. Ct. 2551, 2561 (2015) (quoting Nash v. United States, 229 U.S. 373, 377 (1913)). And where, as here, the statute clearly gave notice to Hosford that he ought not to regularly sell firearms that he only purchased and resold for profit——firearms not acquired for the purpose of a personal collection or for the hobby of collecting firearms——his as-applied vagueness challenge fails. As a result, Hosford's facial challenge also fails.

V.

Lastly, Hosford argues that the prohibition against unlicensed firearm dealing is not a valid exercise of Congress's power under the Commerce Clause. The Commerce Clause allows Congress to regulate (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce, and persons or things in interstate commerce; and (3) activities that "substantially affect" interstate commerce. Gonzales v. Raich, 545 U.S. 1, 16-17 (2005). We join our sister circuits in holding that the prohibition against unlicensed firearm dealing is a valid exercise of Congress's power under the Commerce Clause. See Mandina v. United States, 472 F.2d 1110 (8th Cir.

23

1973); <u>United States v. Hornbeck</u>, 489 F.2d 1325 (7th Cir. 1973) (per curiam).

In <u>Gonzales v. Raich</u>, 545 U.S. 1 (2005), the Supreme Court upheld the federal Controlled Substances Act's application to individuals who grew and consumed marijuana for personal use. See <u>id.</u> at 7. Those individuals cultivated their own marijuana or received marijuana for free from caregivers. They did not purchase or sell marijuana or marijuana products, either interstate or intrastate. <u>Id.</u> at 7.

Despite the intrastate and noncommercial nature of the activity, the Supreme Court held that it had a substantial effect on interstate commerce. The individuals were cultivating, for themselves, a fungible commodity for which there was an established interstate market. <u>Id.</u> at 18. The purpose of the Controlled Substances Act was to "control the supply and demand of controlled substances in both lawful and unlawful drug markets." <u>Id.</u> at 19. Congress had a "rational basis for believing that leaving home-consumed marijuana outside federal control would . . . affect price and market conditions." <u>Id.</u> And lastly, the growing demand for marijuana in the interstate market could draw in-state, homegrown marijuana into the interstate market, thus frustrating Congress's purposes if left unregulated. <u>Id.</u>

More so than the respondents in <u>Gonzales</u>, Hosford——just like similar individuals who would be indicted under this law—— engaged in commercial, inter-personal conduct. He purchased and resold firearms, a fungible commodity for which there is an established interstate market, to unknown individuals. And like the market for marijuana, Congress has a rational basis to believe that leaving intrastate firearm markets unregulated would affect the interstate market or draw firearms purchased intrastate into the interstate market. Indeed, research indicates that firearms found illegally in one state may be traced back to legal purchases in other states. <u>See</u> Steven G. Brandl & Meghan S. Stroshine, <u>The Relationship Between Gun and Gun Buyer Characteristics and Firearm Time-to-Crime</u>, 22 Crim. J. Pol'y Rev. 285, 287 (2011) (noting that all firearms begin on legal market); Glenn L. Pierce et al., Research Note, <u>Characteristics and Dynamics of Illegal Firearms Markets: Implications for a Supply-Side Enforcement Strategy</u>, 21 Just. Q. 391, 401 (2004) (finding that 35% of illegally possessed and traced firearms originated from different state). And in cities such as New York or Boston, where firearm regulations are strictest, the vast majority of illegally possessed firearms originated out of state. Brandl, <u>supra</u> at 289 (New York and Boston have strict regulations); Pierce, <u>supra</u> at 401 (finding

25

that, of firearms traced, 82.6% of firearms recovered in New York originated out of state, and 66.4% of firearms recovered in Boston originated out of state). Leaving the intrastate, commercial sale of firearms unregulated would frustrate Congress's purpose to police the interstate firearms market. For these reasons, the unlicensed dealing of firearms, even in intrastate sales, implicates interstate commerce and may be constitutionally regulated by Congress under the Commerce Clause.

## VI.

For these reasons, the district court's decision not to dismiss Mr. Hosford's indictment is

AFFIRMED.

26