TRAXLER, Circuit Judge,
with whom NIEMEYER, SHEDD, and AGEE, Circuit Judges, join, dissenting:
Today the majority holds that the Government can take semiautomatic rifles *152 away from law-abiding American citizens. In South Carolina, North Carolina, Virginia, West Virginia and Maryland, the Government can now tell you that you cannot hunt with these rifles. The Government can tell you that you cannot shoot at targets with them. And, most importantly, the Government can tell you that you cannot use them to defend yourself and your family in your home. In concluding that the Second Amendment does not even apply, the majority has gone to greater lengths than any other court to eviscerate the constitutionally guaranteed right to keep and bear arms.
In addition, the majority holds that even if it is wrong when it says that the Second Amendment does not cover these commonplace rifles, Maryland can still lawfully forbid their purchase, even for self defense in one’s home-the core Second Amendment right. My friends do not believe this ruling impairs the rights citizens have under the Constitution to any significant degree. In my view, the burden imposed by the Maryland law is considerable and requires the application of strict scrutiny, as is customary when core values guaranteed by the Constitution are substantially affected. I recognize that after such a judicial review, the result could be that the Maryland law is constitutional. I make no predictions on that issue. I simply say that we are obligated by Supreme Court precedent and our own to treat incursions into our Second Amendment rights the same as we would restrictions on any other right guaranteed us by our Constitution.
Therefore I respectfully dissent.
I. The Second Amendment Protects Semiautomatic Rifles and Large Capacity Magazines
A. Semiautomatic rifles are commonly possessed by law-abiding citizens.
The majority says first that the Second Amendment does not even apply to modern semiautomatic rifles or magazines holding more than ten rounds. In doing so, the majority stands alone from all the other courts to have considered this issue. But the scope of the Second Amendment is broad with regard to the kinds of arms that fall within its protection, “extending], prima facie, to all instruments that constitute bearable arms.” District of Columbia v. Heller, 554 U.S. 570, 582, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Of course, like other constitutionally protected rights, “the right secured by the Second Amendment is not unlimited.” Id. at 626, 128 S.Ct. 2783. Of particular importance here are the historical limitations that apply to the types of arms a law-abiding citizen may bear. In that regard, the Second Amendment protects those weapons “typically possessed by law-abiding citizens for lawful purposes.” Id. at 625, 128 S.Ct. 2783. By contrast, “the carrying of ‘dangerous and unusual weapons’ ” has been prohibited as a matter of “historical tradition.” Id. at 627, 128 S.Ct. 2783; see Caeta-no v. Massachusetts, — U.S. -, 136 S.Ct. 1027, 1028, 194 L.Ed.2d 99 (2016) (per curiam). If a weapon is one “typically possessed by law-abiding citizens for lawful purposes,” Heller, 554 U.S. at 625, 128 S.Ct. 2783, then it cannot also be a “dangerous and unusual” weapon in a constitutional sense, id. at 627, 128 S.Ct. 2783 (weapons “in common use at the time” did not include “dangerous and unusual weapons” (internal quotation marks omitted)). Indeed, Heller refers to “dangerous and unusual” conjunctively, so that even a “dangerous” weapon enjoys constitutional protection if it is widely held for lawful purposes. See Gaetano, 136 S.Ct. at 1031 (explaining that the dangerous and unusual test “is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual”) (Alito, J., concur *153 ring). The significance of this rule is that “the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes.” Id. Simply put, if the firearm in question is commonly possessed for lawful purposes, it falls within the protection of the Second Amendment. See Heller, 554 U.S. at 627, 128 S.Ct. 2783.
My colleagues in the majority reject the foregoing “common use” analysis, characterizing it as a “popularity test” founded on “circular” reasoning such that “a state-of-the-art and extraordinarily lethal new weapon ... would need only be flooded on the market prior to any governmental prohibition in order to ensure it constitutional protection.” But the majority’s beef is not with me — it is with the Supreme Court of the United States. Justice Breyer raised a quite similar objection to this “popularity test” in his Heller dissent:
[I]f Congress and the States lift restrictions on the possession and use of machineguns, and people buy machine-guns ... the Court will have to reverse course and find that the Second Amendment does, in fact, protect the individual self-defense-related right to possess a machinegun. On the majority’s reasoning, if tomorrow someone invents a particularly useful, highly dangerous self-defense weapon, Congress and the States had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so.... There is no basis for believing that the Framers intended such circular reasoning.
554 U.S. at 720-21, 128 S.Ct. 2783. Justice Breyer effectively raised my colleagues’ precise criticism in his Heller dissent and the Heller majority was obviously unmoved by it.
And, indeed, following Heller, almost every federal court to have considered “whether a weapon is popular enough to be considered in common use has relied on statistical data of some form, creating a consensus that common use is an objective and largely statistical inquiry.” Hollis v. Lynch, 827 F.3d 436, 449 (5th Cir. 2016) (internal quotation marks omitted). It is beyond any reasonable dispute from the record before us that a statistically significant number of American citizens possess semiautomatic rifles (and magazines holding more than 10 rounds) for lawful purposes. Between 1990 and 2012, more than 8 million AR- and AK- platform semiautomatic rifles alone were manufactured in or imported into the United States. In 2012, semiautomatic sporting rifles accounted for twenty percent of all retail firearms sales. In fact, in 2012, the number of AR- and AK- style weapons manufactured and imported into the United States was “more than double the number of the most commonly sold vehicle in the U.S., the Ford F-150.” J.A. 1878. In terms of absolute numbers, these statistics lead to the unavoidable conclusion that popular semiautomatic rifles such as the AR-15 are commonly possessed by American citizens for lawful purposes within the meaning of Heller.
The number of jurisdictions where possession of semiautomatic rifles is lawful is also an appropriate consideration in determining common use for lawful purposes. See Caetano, 136 S.Ct. at 1032-33 (Alito, J., concurring) (explaining that the 200,000 tasers and stun guns in the United States are commonly possessed for lawful purposes and “widely owned and accepted as a legitimate means of self-defense across the country” where 45 states permit their lawful possession). The semiautomatic rifle has been in existence since at least the turn of the Twentieth Century. Today, more than 100 years after these firearms came into use, individual citizens may possess semiautomatic rifles like the AR-15 *154 semiautomatic in at least 44 states, which establishes that these weapons are widely accepted across the country as firearms that may be legitimately possessed for lawful purposes. See Robert J. Cottrol and George A. Mocsary, Guns, Bird Feathers, and Overcriminalization: Why Courts Should Take the Second Amendment Seriously, 14 Geo. J. L. & Pub. Pol’y 17, 36 (2016) (noting that “[s]even states, the District of Golumbia, and a few localities regulate or ban so-called assault weapons”); see id. at 36 n.106 (“The states [banning or regulating “assault weapons”] are California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York.”).[1]
In view of the significant popularity of these firearms, courts -have had little difficulty in concluding that semiautomatic rifles such as the AR-15 are in common use by law-abiding citizens. See, e.g., Heller v. District of Columbia (“Heller II”), 670 F.3d 1244, 1261 (D.C. Cir. 2011) (“We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in ‘common use,’ as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market.”); New York State Rifle & Pistol Ass’n, Inc. v. Cuomo, 804 F.3d 242, 255 (2d Cir. 2015) (“This much is clear: Americans own millions of the firearms that the challenged legislation prohibits. ... Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are ‘in common use’ as that term was used in Heller.”); Colorado Outfitters Ass’n v. Hickenlooper, 24 F.Supp.3d 1050, 1068 (D. Colo. 2014) (concluding that statute “affects the use of firearms that are both widespread and commonly • used for self-defense,” in view of the fact that “lawfully owned semiautomatic firearms using- a magazine with the capacity of greater than 15 rounds number in the tens of millions”), vacated in part on other grounds, 823 F.3d 537 (10th Cir. 2016).
The record also shows unequivocally that magazines with a capacity of greater than 10 rounds are commonly kept by American citizens, as there are more than 75 million such magazines owned by them in the United States. These magazines are so common that they are standard on many firearms: “[0]n a nationwide basis most pistols are manufactured with magazines holding ten to 17 rounds.” J.A. 2122. Even more than 20 years ago, “fully 18-percent of all firearms owned by civilians ... were equipped with magazines holding more than ten rounds.” Heller II, 670 F.3d at 1261; see Fyock v. City of Sunnyvale, 779 F.3d 991, 998 (9th Cir. 2015) (“[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, [such] magazines are in common use.”)[2]
Millions of Americans keep semiautomatic rifles and use them for lawful, noncriminal activities, including as a means to defend their homes. Plaintiffs Kolbe and Turner both seek to acquire and keep semi-automatic rifles, equipped with magazines able to hold more than 10 rounds, in *155 their homes primarily for self-defense — a common and legitimate purpose for possessing these firearms. Plaintiffs’ expert James Cureuruto presented survey evidence showing that self-defense was a primary reason for the purchase of weapons banned under the FSA, and a 1989 Report from the Bureau of Alcohol, Tobacco, and Firearms indicated that self-defense was a suitable purpose for semiautomatic rifles. The State’s expert Daniel Webster even agreed that it is reasonable to assume that a purpose for keeping one of the prohibited weapons is “self-defense in the home.” J.A. 2291.
Because the evidence before us clearly demonstrates that these popular weapons are commonly possessed for lawful purposes and are therefore not dangerous and unusual, they are covered by the Second Amendment. The majority errs in holding otherwise.[3]
B. The Majority’s Balancing Test is contrary to Heller.
Rather than apply the Supreme Court’s common-use test to determine whether the Second Amendment applies to a particular type of weapon or magazine, the majority creates a heretofore unknown “test,” which is whether the firearm in question is “most useful in military service.”[4] Under this newly-birthed test, which seems to be a stand-alone inquiry, the Second Amendment does not apply if a court deems a weapon “most useful” in combat operations. And in the case before us today, the majority concludes that the Second Amendment does not apply at all because semiautomatic rifles, in the military opinion of the majority, are more useful as military weapons than as weapons for individual self-defense, hunting and target or sport shooting. See Majority Op. at 137 (“Whatever their other potential uses— including self-defense — the AR-15, other assault weapons, and large-capacity magazines prohibited by the FSA are unquestionably most useful in military service.”). This analysis is clearly at odds with the Supreme Court’s approach in Heller setting out how courts, including the majority, are to go about a Second Amendment inquiry.[5]
*156 First, the majority simply ignores “the pertinent Second Amendment inquiry”— “whether [the firearms at issue] are commonly possessed by law-abiding citizens for lawful purposes today.” Caetano, 136 S.Ct. at 1032 (Alito, J., concurring) (emphasis omitted). But, this omission is understandable in light of the millions of law-abiding Americans who possess the semiautomatic rifles at issue, as explained previously. It is beyond debate.
Second, the majority makes no attempt to demonstrate that semiautomatic rifles have been historically prohibited as “dangerous and unusual” weapons. Instead, our court today has adopted an ad hoc analysis that excludes a weapon from Second Amendment protection if it appears to be “like” an M-16 or “most useful in military service.” Under this approach, it is irrelevant that a firearm may have been commonly possessed and widely accepted as a legitimate firearm for law-abiding citizens for hundreds of years; such a weapon could be removed from the scope of the Second Amendment so long as a court says it is “like” an M-16 or, even easier, just calls it a “weapon of war.” Indeed, Justice Alito pointed out in his Caetano concurrence that even a stun gun capable of only non-lethal force is suitable for military use. See id. Obviously, what the majority ignores from Heller is that “weapons that are most useful in military service — M-16 rifles and the like” — are not “typically possessed by law-abiding citizens” today. Heller, 554 U.S. at 625, 627, 128 S.Ct. 2783. While the majority’s quoted reference from Heller would exclude weapons “most useful in military service” such as Gatling guns, mortars, bazookas, etc., no one could claim these items were ever commonly possessed for Second Amendment purposes. Indeed, such “M-16 rifles and the like” are outside the Second Amendment because they “are highly unusual in society at large.” Id. at 627, 128 S.Ct. 2783.
Third, Heller in no way suggests that the military usefulness of a weapon disqualifies it from Second Amendment protection. That is the majority’s singular concoction. On the contrary, the Second Amendment has always been understood to cover weapons useful in military operations. Indeed, the Second Amendment at the Founding was grounded in the need to safeguard the commonly possessed weapons of citizens for military service. “[A]t the time of the Second Amendment’s ratification,” it was understood that “all citizens capable of military service ... would bring the sorts of lawful weapons that they possessed at home to militia duty.” Heller, 554 U.S. at 627, 128 S.Ct. 2783. “ ‘Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.’ ” Id. at 624, 128 S.Ct. 2783 (quoting United States v. Miller, 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939)) (alterations omitted). Under the majority’s analysis, a settler’s musket, the only weapon he would likely own and bring to militia service, would be most useful in military service — undoubtedly a weapon of war — and therefore not protected by the Second Amendment. This *157 analysis turns Heller on its head. Indeed, the Court in Heller found it necessary to expressly reject the view that “only those weapons useful in warfare are protected.” Id. (emphasis added). Weapons useful in warfare are obviously protected by the Second Amendment; if this were not so, the Court would have had no reason to caution against the assumption that the Second Amendment protects only weapons useful in military operations.
Read in context, Hellers reference to “weapons that are most useful in military service” clearly does not provide some alternative to the “in common use” query for determining whether the Second Amendment applies. If it were otherwise, the “most useful in military service” rubric would remove nearly all firearms from Second Amendment protection as nearly all firearms can be useful in military service. Heller settled “a decades-long debate between those who interpreted the text to guarantee a private, individual right to bear arms and those who genex-ally read it to secure a collective right to bear arms in connection with service in the state militia.” Chester, 628 F.3d at 674-75. Heller determined that the prefatory clause of the Second Amendment, which refers to the militia, does not limit the right to “keep and bear Arms” set forth in the operative clause, 554 U.S. at 578, 128 S.Ct. 2783, and therefore that the Second Amendment “protects an individual right to possess a firearm unconnected with service in a militia,” id. at 577, 128 S.Ct. 2783. In addressing the criticism that the Court had simply read the prefatory clause out of the Second Amendment, the Court explained:
It may be objected that if weapons that are most useful in military service — M-16 rifles and the like — may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment’s ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modem developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right.
Id. at 627-28, 128 S.Ct. 2783 (emphasis added). Thus, because the Second Amendment “protects an individual right to possess a firearm unconnected with service in a militia,” id. at 577, 128 S.Ct. 2783, “whether a weapon has a nexus to military utility is not the test as to whether that weapon receives Second Amendment protection,” Hollis, 827 F.3d at 446.
In sum, if a “weapon belongs to a class of arms commonly used for lawful purposes,” Caetano, 136 S.Ct. at 1031 (Alito, J., concurring), then it comes within the ambit of the Second Amendment and our threshold inquiry is at an end. The fact that a weapon is designed “for the purpose of bodily assault” and “constructed to produce death or great bodily harm” “cannot be used to identify arms that fall outside the Second Amendment.” Id. (internal quotation marks omitted). That is, “the relative dangerousness of a weapon is irrelevant” where the weapon is “commonly used for lawful purposes.” Id. Under Heller, therefore, even a weapon that some court concludes has militarily useful features or is too dangerous for civilians to possess is. covered by the Second Amendment if it is “commonly used for lawful purposes.”
*158 C. It is anything but clear that semiautomatic sporting rifles are “weapons of war.”
The majority concludes that the semiautomatic rifles banned by Maryland law are most useful in military service, even though they are not in regular use by any military force, including the United States Army, whose standard-issue weapon has been the fully automatic Ml 6- and M4-series rifles. See Hollis, 827 F.3d at 440 n.2.
In its effort to show that semiautomatic rifles are devastating weapons of. war whose only legitimate purpose is to lay waste to a battlefield full of combatants, the majority first states that the rates of fire between the fully automatic M16 service rifle and the semiautomatic AR-15 sporting rifle are “nearly identical.” This claim seems counter-intuitive because semiautomatic firearms require that the shooter pull the trigger for each shot fired, while fully automatic weapons — otherwise known as “machine guns” — do not require a pull of the trigger for each shot and will discharge every round in the magazine as long as the trigger is depressed. See Staples v. United States, 511 U.S. 600, 602 n.1, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994). The rate of fire of a semiautomatic firearm is determined simply by how fast the shooter can squeeze the trigger.
The majority’s assertion might surprise the United States Army, which sets the maximum effective rates of M4- and Miseries rifles operating in semi-automatic mode at 45 to 65 rounds per minute — only about five rounds in five seconds (not 30 rounds as the majority believes). This is far slower than 150 to 200 rounds per minute that may effectively be fired by the same arms operating in fully automatic mode. See United States Dep’t of Army, Field Manual 3-22.9, Rifle Marksmanship, M16-/M4-Series Weapons, Table 2-1 (2008). Some of the experts at the Bureau of Alcohol, Tobacco, Firearms and Explosives (“BATF”) might be surprised as well, in light of the testimony submitted to Congress on behalf of BATF:
The AK-47 is a select fire weapon capable of firing 600 rounds per minute on full automatic and 40 rounds per minute on semi-automatic. The AKS and AK-47 are similar in appearance. The AK-47 ... [has] been manufactured as a machine gun.... The AKS is a semi-automatic that, except for its deadly military appearance, is no different from other semi-automatic rifles.
Hearings on S. 386 Before the Subcomm. on the Constitution of the Senate Comm, on the Judiciary, 101st Cong. 28-29 (1989).
Of course, if the majority is correct that the semiautomatic AR-15’s rate of fire makes it a weapon of war outside the scope of the Second Amendment, then all semiautomatic firearms — including the vast majority of semiautomatic handguns — enjoy no constitutional protection since the rate of fire for any semiautomatic firearm is determined by how fast the shooter can squeeze the trigger. Such a conclusion obviously flies in the face of Heller, which never mentions rate of fire as a relevant consideration. Likewise, the suggestion that the ability to accept large-capacity magazines facilitates a firearm’s military usefulness applies to all semiautomatic weapons, including constitutionally-protected handguns, since any firearm that can hold a magazine can theoretically hold one of any size.
The majority also suggests that other features of semiautomatic rifles like the AR-15 make them devastating military weapons. But several of the features identified do not make the firearms more lethal or battle-ready, but easier to use. On the contrary, many of the “military-style” components “increase accuracy and improve *159 ergonomics.” J.A. 2100. A telescoping stock, for example, permits the operator to adjust the length of the stock according to his or her physical size so that the rifle can be held comfortably. J.A. 2182. Likewise, a pistol grip provides comfort, stability, and accuracy, see David B. Kopel, Rational Basis Analysis of “Assault Weapon” Prohibition, 20 J. Contemp. L. 381, 396 (1994) (“By holding the pistol grip, the shooter keeps the barrel from rising after the first shot, and thereby stays on target for a follow-up shot. The defensive application is obvious, as is the public safety advantage in preventing stray shots.”), and barrel shrouds keep the operator from burning himself or herself upon contact with the barrel.[6] And although flash suppressors can indeed conceal a shooter’s position— which is also an advantage for someone defending his or her home at night — they serve the primary function of preventing the shooter from being blinded in low-lighting conditions. See Kopel, at 397 (“Reduced flash decreases shooter’s blindness — the momentary blindness caused by the sudden flash of light from the explosion of gunpowder. The flash reduction is especially important for shooting at dawn or at dusk.”). None of these features convert a semiautomatic rifle into a weapon of war like a machinegun carried into battle by actual soldiers. It is unclear to me why features that make a firearm easier and safer to operate add to its battlefield prowess.[7]
In deciding that the banned semiautomatic rifles “are unquestionably most useful in military service,” the majority cavalierly dismisses “their other potential uses” without discussion. The irony is that millions of law-abiding Americans actually use these versatile guns, while there do not seem to be any military forces that routinely carry an AR-15 or other semiautomatic sporting rifles as an officially-issued service weapon — at least the majority has not identified any. If these firearms were such devastating weapons of war, one would think that they would be standard issue for military forces across the globe. Whatever the potential military usefulness of these weapons, millions of American citizens actually use them for sporting purposes and possess them to defend themselves, their families and their homes. Indeed, plaintiffs’ evidence suggests that “[t]he semi-automatic AR15 carbine is likely the most ergonomic, safe, readily available and effective firearm for civilian self-defense.” J.A. 2091.[8]
The semiautomatic firearms banned by Maryland are commonly “chosen by Americans for self-defense in the home” and are thus clearly protected by the Second *160 Amendment — “[wjhatever the reason” for their popularity. Heller, 554 U.S. at 629, 128 S.Ct. 2783. The real question is whether the district court applied the appropriate level of scrutiny in determining any limitations on Second Amendment protection. As explained below and in the now-vacated panel opinion, see Kolbe, 813 F.3d at 179-84, it did not.
II. Strict Scrutiny Applies
To select the proper level of scrutiny, we consider “the nature of the conduct being regulated and the degree to which the challenged law burdens the right.” Chester, 628 F.3d at 682. “A severe burden on the core Second Amendment right of armed self-defense should require strong justification.” United States v. Masciandaro, 638 F.3d 458, 470 (4th Cir. 2011) (internal quotation marks omitted). However, . “laws that do not implicate the central self-defense concern of the Second Amendment[ ] may be more easily justified.” Id. (internal quotation marks omitted); see Nat’l Rifle Ass’n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 700 F.3d 185, 195 (5th Cir. 2012) (“A less severe regulation — a regulation that does not encroach on the core of the Second Amendment — requires a less demanding means-ends showing.”).
Maryland’s ban on the AR-15 and other semiautomatic rifles forbids its law-abiding citizens from purchasing commonly possessed firearms for use in their homes for the protection of self and family. By reaching into private homes, where the protection afforded by the Second Amendment is at its greatest, Maryland’s law clearly implicates the “core” of the Second Amendment: “the.right of law-abiding, responsible citizens to use arms in defense of hearth and home.” Heller, 554 U.S. at 635, 128 S.Ct. 2783. The Supreme Court in Heller made clear that the “inherent right of self-defense has been central to the Second Amendment,” id. at 628, 128 S.Ct. 2783 (emphasis added), and that this central component of the Second Amendment is at its strongest within “the home where the need for defense of self, family, and property is most acute,” id. See also Kachalsky v. County of Westchester, 701 F.3d 81, 89 (2d Cir. 2012) (“What we know from [Heller and McDonald v. City of Chicago] is that Second Amendment guarantees are at their zenith within the home.”). At stake here is a “basic right,” McDonald v. City of Chicago, 561 U.S. 742, 767, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), “that the Framers and ratifiers of the Fourteenth Amendment counted ... among those fundamental rights necessary to our system of ordered liberty,” id. at 778, 130 S.Ct. 3020. “The [Supreme] Court [in Heller] went to great lengths to emphasize the special place that the home-an individual’s private property-occupies in oúr society.” Georgia-Carry.Org, Inc. v. Georgia, 687 F.3d 1244, 1259 (11th Cir. 2012).
The majority is incredulous that we would apply strict scrutiny to a law prohibiting the possession of a commonly used firearm to protect family and home. But, of course we would apply strict scrutiny — we have no other alternative in these circumstances. Once it is determined that a given weapon is covered by the Second Amendment, then obviously the in-home possession of that weapon for self-defense is core Second Amendment conduct and strict scrutiny must apply to a law that prohibits it. This position is not remarkable in the least, and I am not alone in this circuit in adhering to it. Indeed, a panel of this court recently made very clear in United States v. Hosford that strict scrutiny applies when a law restricting possession of a firearm applies to conduct inside of the home and touches on self-defense concerns. See 843 F.3d 161, 168 (4th Cir. 2016). In Hosford, which was decided after *161 en banc argument in this case, the defendant raised a Second Amendment challenge to his conviction under a law that “impose[d] a licensing requirement on those who wish[ed] to profit by regularly selling firearms outside of their personal collection.” Id. In explaining why the law at issue there should receive only intermediate scrutiny, the panel stated as follows:
Here, even assuming that the prohibition implicates conduct protected by the Second Amendment, the prohibition does not touch on the Second Amendment’s core protections. Individuals remain free to possess firearms for self-defense. Individuals also remain free to purchase or sell firearms owned for personal, self-defensive use.... [The law] serves, not as a prohibition, but as a condition or qualification. The law, therefore, regulates rather than restricts, addresses only conduct occurring outside the home, and does not touch on self-defense concerns. It is thus subject to intermediate scrutiny.
Id. (emphasis added). In this passage, the Hosford panel very ably shows why intermediate scrutiny is required there, but strict scrutiny is required here. Under the Maryland law we consider today, individuals do not remain free to purchase or possess the banned firearms for self-defense inside of their homes. Thus, Maryland’s law restricts rather than regulates; it addresses conduct occurring inside the home; and it directly touches self-defense concerns in the home. Maryland’s law imposes dramatic limitations on the core protections guaranteed by the Second Amendment and, as implicitly admitted by the Hosford panel, requires the court to apply strict scrutiny.
My friends in the majority do not apply strict scrutiny because they do not believe that the Maryland law significantly burdens the “core lawful purpose” of the Second Amendment. Their reasoning? Maryland left handguns (and other weapons) for its residents to use to defend their homes, and this ought to be enough. This line of thought was expressly rejected by the Supreme Court in Heller, which dismissed the District of Columbia’s reverse contention that its handgun ban did not unconstitutionally burden the right to self-defense because long guns were still permitted for home defense. See Heller, 554 U.S. at 629, 128 S.Ct. 2783 (“It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed.”); accord Parker v. District of Columbia, 478 F.3d 370, 400 (D.C. Cir. 2007) (rejecting the District’s argument that alternative weapons rendered handgun ban lawful, calling it “frivolous,” and noting that “[i]t could be similarly contended that all firearms may be banned so long as sabers were permitted”). As long as the firearms chosen are those commonly possessed by the American people for lawful purposes — and the rifles at issue here most certainly are — states cannot prohibit their residents from purchasing them for self-defense in the home unless that restriction • can meet strict scrutiny review.
The majority, however, implies that this portion of Heller does not apply to a ban of commonly possessed firearms if handguns are still available to the homeowner because handguns are “the quintessential self-defense weapon.” 554 U.S. at 629, 128 S.Ct. 2783. If the majority were correct, then any state “would be free to ban all weapons except handguns, because handguns are the most popular weapon chosen by Americans for self-defense in the home.” Caetano, 136 S.Ct. at 1032 (Alito, J., concurring) (internal quotation marks omitted). Under the majority’s logic, a state could similarly ban all shotguns, even those commonly used in hunting, and not *162 transgress the Second Amendment, so long as handguns remained lawful to possess. The fact that handguns are still available is irrelevant. If other firearms,' though “less popular than handguns,” are nonetheless “widely owned and accepted as a legitimate means of self-defense across the country,” they cannot be banned simply because more popular handguns are not. Id. at 1033. •'
Finally, we are told that the ban on semiautomatic rifles is not burdensome because these weapons are not even well-suited for defense of hearth and home— handguns are better and that is all law-abiding citizens need.[9] This is patently wrong. First, there are legitimate reasons for citizens to favor semiautomatic rifles over handguns in defending themselves and their families at home. The record contains evidence, which on summary judgment was to be viewed in the light most favorable to the plaintiffs, suggesting that “handguns are inherently less accurate than long guns” as they “are more difficult to steady” and “absorb less of the recoil[,] ... [thus] reducing accuracy.” J.A. 2131. This can be an important consideration for a typical homeowner, who “under the extreme duress of an armed and advancing attacker is likely to fire at, but miss, his or her target.” J.A. 2123. “Nervousness and anxiety, lighting conditions, the presence of physical obstacles ..., and the mechanics of retreat are all factors which contribute to [the] likelihood” that the homeowner will shoot at but miss a home invader. Id. These factors could also affect an individual’s ability to reload a firearm quickly during a home invasion. Similarly, a citizen’s ability to defend himself and his home is enhanced with an LCM.
Second, the means selected by citizens to defend themselves and their families at home is an intensely personal choice dependent upon circumstances unique to each individual. Not everyone who would bear arms in defense of his home is comfortable or confident using a handgun. As long as the weapon chosen is one commonly possessed by the American people for lawful purposes — and the rifles at issue here most certainly are — the state has very little say about whether its citizens should keep it in their homes for protection. “The question under Heller is not whether citizens have adequate alternatives available for self-defense. Rather, Heller asks whether the law bans types of firearms commonly used for a lawful purpose — regardless of whether alternatives exist.” Friedman v. City of Highland Park, - U.S. -, 136 S.Ct. 447, 449, 193 L.Ed.2d 483 (2015) (Thomas, J., dissenting from the denial of certiorari). “[T]he Second Amendment confers rights upon individual citizens — not state governments,” and it clearly does not “delegate to States and localities the power to decide which firearms people may possess.” Id. “The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is really worth insisting upon.” Heller, 554 U.S. at 634, 128 S.Ct. 2783.
Nevertheless, Maryland has taken the choice away from its residents and simply determined that, regardless of the circumstances in any case, its people, whether living in a 700 square-foot apartment or a *163 50-acre farm, may only protect their loved ones with one of the guns the State thinks they should use — perhaps a handgun, or a slow-to-load bolt-action hunting rifle or a shotgun with heavy recoil. “The right to self-defense is largely meaningless if it does not include the right to choose the most effective means of defending oneself.” Friedman v. City of Highland Park, 784 F.3d 406, 418 (7th Cir. 2015) (Manion, J., dissenting). Indeed, “the ultimate decision for what constitutes the most effective means of defending one’s home, family, and property resides in individual citizens and not the government.... The extent of danger — real or imagined — that a citizen-faces at home is a matter only that person can assess in full.” Id. at 418.
For a law-abiding citizen who,' for whatever reason, chooses to protect his home with a semi-automatic rifle instead of a semi-automatic handgun, Maryland’s law clearly imposes a significant burden on the exercise of the right to arm oneself at home, and it should at least be subjected to strict scrutiny review before it is allowed to stand.
For the reasons I have set forth, I respectfully dissent.

. Although Hawaii is listed, it bans assault pistols only; semiautomatic rifles, such as the AR-15 are still permitted in Hawaii. See Haw. Rev. Stat. §§ 134-1, 134-4, 134-8.

. Although the majority does not reach the issue of whether detachable magazines constitute bearable arms entitled to Second Amendment protection, such magazines quite clearly constitute arms for the reasons set forth in the now vacated panel opinion. See Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016).

. It is evident that my good friends in the majority simply do not like Heller s determination that firearms commonly possessed for lawful purposes are covered by the Second Amendment. In the majority's view, Heller s “commonly possessed” test produces unacceptable results in this case, providing Second Amendment coverage for semiautomatic rifles owned by less than 1% of the American public and thwarting “efforts by the other 99%” to ban them. Majority Op. at 141. This assertion rests on the false premise that every American who does not own a semiautomatic rifle wishes to ban them. That is quite a stretch. In fact, a recent Gallup poll shows that public support for a so-called assault weapons ban is at 36%. Thus, for what it is worth, substantially more Americans oppose a ban than favor it. See www.gallup.com/poll/196658/support-assault-weapons-ban-record-low.aspx (last visited Feb. 13, 2017).

. Since the majority has not previously articulated this novel interpretation of Heller, neither side in the district court focused its evidence or legal arguments on proving or disproving that semiautomatic rifles such as the AR-15 are “most useful” as military weapons or on the question of whether qualifying as "militarily useful” would remove the weapon from Second Amendment protection. And the district court likewise did not address these questions. If this is the new standard, then basic fairness requires that the plaintiffs have an opportunity to squarely meet the issue. See United States v. Chester, 628 F.3d 673, 683 (4th Cir. 2010) ("Having established the appropriate standard of review, we think it best to remand this case to afford the government an opportunity to shoulder its burden and Chester an opportunity to respond. Both sides should have an opportunity to present their evidence and their arguments to the district court in the first instance.”).

. In articulating and then applying its novel military usefulness test, not only has the majority failed to afford plaintiffs an opportunity to respond, but it has abandoned the summary judgment standard and reached a conclusion based on facts viewed in the light most favorable to the State, the proponent of the summary judgment motion, and not the plaintiffs as the non-movants. See Woollard v. Gallagher, 712 F.3d 865, 873 (4th Cir. 2013) (applying Fed. R. Civ. P. 56(a) in Second Amendment context and "viewing the facts and inferences reasonably drawn therefrom in the light most favorable to the nonmoving party”).

. These features, the majority suggests, enable a shooter to "spray-fire” rounds everywhere. "Spray-firing” can only be accomplished with a fully automatic assault rifle like an M4 carbine; "[i]n semiautomatic mode it is possible to either aim fire or to point shoot, but it is not possible to spray fire in the manner as one would in fully automatic mode.” J.A. 2128.

. Nor does it appear that an AR-15-style rifle fires rounds that create a greater risk to civilians than rounds fired by a standard hunting rifle. In fact, just the opposite is true. The AR-15’s standard .223/5.56 mm ammunition is "quite anemic in penetration capability and pale[s] in destructive' capacity when compared to common civilian hunting rifles....” J.A. 2095.

.The majority’s utilization of the "military use” theory instead of the common use test produces ironic results. For example, the law my colleagues uphold today permits Maryland residents to possess the Ml Garand rifle, which was the standard-issue battle rifle for American troops in World War II and the Korean War. The result of the holding in this case is that it is legal in Maryland to possess a rifle that was actually used by our military on the battlefield, but illegal to possess a rifle never used by our military.

. If, as the majority says, there is "scant evidence” that the prohibited semiautomatic rifles are well-suited for home defense, then there- is even less reason to believe that these weapons are best suited for combat operations. After all, it cannot be disputed that one reason non-criminal citizens actually keep these weapons at home is for self-defense. I have searched the record in vain for the statistics on how many standing armies issue AR-15s or semiautomatic-only-weapons to their troops. I do not believe there are any.